Abraham SARKIS (IAN) and Razmik
Mourad (IAN), Petitioners,

v.

Alan C. NELSON, Commissioner Immi-
gration and Naturalization Service,
Hugh J. Brien, Assistant Commissioner
Detention and Deportation Immigra-
tion and Naturalization Service, Timo-
thy Whelan, Acting District Director,
Boston District Office Immigration and
Naturalization Service and Charles C.
Sava, District Director, New York Dis-
trict Office, Immigration and Naturali-
zation Service, Respondents.

No. 83 CV 2087.

United States District Court,
E.D. New York,
Civil Division.

April 12, 1984.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Edward N. Costikyan, Diane Englander, New York City, of counsel), Milton C. Gelenian, Washington, D.C., for petitioners.

Raymond J. Dearie, U.S. Atty., E.D.N.Y., Brooklyn, N.Y. (Michael P. DiRaimondo, Sp. Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for respondents.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

In this petition for a writ of habeas corpus under 8 U.S.C. § 1105a(b), Abraham Sarkis and Razmik Mourad challenge the January 6, 1984 decision by the Board of Immigration Appeals (the "Board") that denied their applications for (1) political asylum under 8 U.S.C. § 1158(a); and (2) temporary withholding of deportation under 8 U.S.C. § 1253(h).[1]

### Factual Background

Sarkis is the twenty-year old uncle of Mourad, who is nineteen. Both are Armenian Christians and citizens of Iraq. They independently left Iraq after allegedly suffering detention and beatings because they had declined invitations to become members of the ruling Ba'ath Party.

After leaving Iraq, Mourad spent some time in Jordan, Yugoslavia and Greece. Sarkis also went to Yugoslavia and Greece before joining Mourad for the trip to this country. Travelling with Iraqui passports but without visas for the United States, petitioners flew from Athens to Boston, where they were scheduled to board a connecting flight to Mexico City. Instead of doing so, however, petitioners presented themselves to an immigration officer at the airport in Boston[2] and requested political asylum. They were immediately taken into custody on June 17, 1982 and have been detained since that time at the Brooklyn Processing Center.

### Procedural History

On August 3, 1982, a hearing was held before an Immigration Judge in Boston. In a written opinion, he denied petitioners' applications for asylum and withholding of deportation, and ordered petitioners' exclusion and deportation.

Petitioners subsequently retained new counsel, who then moved to reopen the hearing to present further evidence on petitioners' fear of persecution. The motion to reopen was granted, and on March 29, 1983 a remand hearing was held.

Because tape recorded portions of the testimony given at the remand hearing subsequently proved inaudible, a second remand hearing was ordered on May 24, 1983. Witnesses who testified on behalf of petitioners included petitioners themselves, Doman Sarkis (Abraham Sarkis's brother), Jasin Salah Al-Azzawi (an Iraqi national currently employed by the United States Department of State), and one Father Hagopian (of the Armenian Apostolic Church).

At the conclusion of the second remand hearing, the Immigration Judge again denied the applications for asylum and withholding of deportation, and ordered exclusion and deportation. In a sixteen-page written opinion issued on January 6, 1984, the Board dismissed petitioners' appeal and entered a final order of exclusion and deportation.

### The Burden of Proof And Standard of Review

1. Withholding of Deportation

Applications for withholding of deportation are governed by 8 U.S.C. § 1253, which provides that:

---

1. Having entered the United States without valid entry documents, petitioners do not contest their excludability under 8 U.S.C. § 1182(a)(20).

2. Sarkis's brother, Doman Sarkis, whose own immigration status is unclear, though immaterial to this petition, resides in Boston.

The Attorney General *shall not deport* or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1253(h)(1) (emphasis added).[3]

 The burden of demonstrating entitlement to withholding of deportation rests upon petitioners. To meet it, they must show a "likelihood of persecution," for one of the reasons ennumerated in § 1253(h)(1) if they are deported to Iraq. *See McMullen v. INS*, 658 F.2d 1312, 1317 (9th Cir.1981). The Board's denial of petitioners' applications for § 1253 relief will be upheld in this habeas corpus proceeding if supported by substantial evidence.[4] *Id.* at 1316.

2. Asylum

Under 8 U.S.C. § 1158(a), an alien "may be granted asylum in the discretion of the Attorney General if he determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) [of Title 8]." Section 1101(a)(42)(A), in turn, defines "refugee" as:

Any person who is outside any country of such person's nationality ... and who is unwilling to return to, and unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion....

 The burden of establishing entitlement to asylum rests upon petitioners. In order to meet it, they must demonstrate that they are "refugees", *i.e.*, that they have "a well-founded fear of persecution" for one of the reasons ennumerated in § 1101(a)(42)(A) if they are returned to Iraq.

In a habeas corpus proceeding to challenge a denial of asylum, the role of a district court is elusive. The Government notes that unlike § 1253(h)(1), which makes withholding of deportation *mandatory* if the applicant demonstrates a likelihood of persecution, § 1158(a) gives the Attorney General *discretion* to deny asylum even when the applicant establishes his statutory eligibility to asylum under the provisions of § 1101(a)(42)(A). Developing this distinction, the Government then argues that in a habeas corpus proceeding to review the Attorney General's decision to deny asylum a district court cannot review the decision under the "substantial evidence" test; instead, the Government concludes, the district court must limit its inquiry to whether the Attorney General abused the discretion which § 1158(a) clearly accords him.

Petitioners, however, counter that § 1158(a) first requires the Attorney General to determine whether they are "refugees" within the meaning of § 1101(a)(42)(A); and that determination, being factual in nature, is, according to the petitioners, subject to review under the substantial evidence test. In support of their position, they offer the following *dicta* from *Chun v. Sava*, 708 F.2d 869 (2d Cir.1983):

Nothing that we have said, of course, goes to the substantive question whether petitioners are in fact entitled to be treated as asylees. Resolution of this question requires the development of a factual record, for Congress, in accordance with treaty law, has instructed the INS to deny asylum in certain circumstances,

---

**3.** Subdivision (h)(2) of § 1253 states exceptions to subdivision (h)(1)'s mandatory language. Those exceptions, however, do not apply here.

**4.** Prior to the enactment of the present § 1253(h)(1), withholding of deportation was at the discretion of the Attorney General. His determination was reviewable only for an abuse of discretion. The current version of the stat-

ute, however, makes withholding of deportation mandatory where a likelihood of persecution is demonstrated. That "likelihood of persecution" is a non-discretionary factual finding, which, accordingly, is subject to review under the "substantial evidence" test. *McMullen v. INS, supra,* 658 F.2d at 1316.

including a determination that an alien applicant is not a refugee within the meaning of the Act. And of course the Attorney General shall not deport or return alien refugees, as a matter of statutory law, 8 U.S.C. § 1253(h)(1), as well as of treaty law, United Nations Protocol, *supra*, art. 33(1). *Congress's limitation on the Attorney General's discretion requires careful fact-finding. Were the substantive question before us, the issue on appeal would be whether there was substantial evidence on the record as a whole to support the INS decision. McMullen v. INS,* 658 F.2d 1312, 1316 (9th Cir.1981); *see also Stevic v. Sava,* 678 F.2d [401] at 404, and whether the INS decision was based on the requirements of statute and treaty.

*Id.,* at 876 (footnotes omitted).

Because the above-quoted paragraph refers to both the discretionary granting of asylum and the mandatory withholding of deportation in appropriate factual settings, it is not entirely clear whether the Second Circuit would review a denial of asylum under the substantial evidence test or under the abuse of discretion test. Nevertheless, the statements in *Chun* that "Congress's limitation on the Attorney General's *discretion* requires careful fact finding," and that the INS decision is reviewable under the substantial evidence test, cannot refer to applications for withholding of deportation; the amendment to § 1253(h) divested the Attorney General of discretion in those matters. The reference, therefore, must be to asylum cases, where the Attorney General still enjoys "discretion."

■ Thus, at least in a case, such as this, where the Board denies political asylum not as a matter of discretion, but as a result of its factual determination that petitioners have not demonstrated a well-founded fear of persecution, its determination must be supported by substantial evidence. Because the standard is unclear, however, and

to avoid further delay in a case where petitioners have already been detained some twenty months, I shall also review the Board's decision to deny political asylum to determine whether there has been an abuse of discretion, an admittedly higher standard.

### The Merits

I reiterate that the burden of showing entitlement to asylum or withholding of deportation rests with petitioners. I find that the petitioners' evidence paints the following scenario: (1) the oppressive political climate of Iraq; (2) the disaffection between members of the Ba'ath Party and its political rivals; (3) the oppressive attitude of the Ba'ath Party toward Armenian Christians; (4) systematic, though general, restrictions imposed by the Ba'ath Party upon religious activities; and (5) the existence of Iraqi laws prescribing the death penalty for both military deserters and draft evaders.

■ Although all of this evidence is relevant to a determination of whether a particular individual's fear of persecution is well-founded, even more probative is evidence of specific instances of violence visited upon the individual or others similarly situated. Here, petitioners have introduced evidence of specific instances of violence and political pressure. Both men testified that they were detained and beaten after refusing invitations to join the Ba'ath Party.

The Board held that petitioners had not shown that their refusal to join the Ba'ath Party was based on their "religious" beliefs. That may be. But both § 1158(a) and § 1253(h) encompass persecution based upon "political opinion" as well as religious beliefs. Thus, the Board should have determined whether petitioners' refusal to join the Ba'ath Party constituted a statement of political opinion for which petitioners could legitimately fear reprisal if returned to Iraq.[5]

5. Although the Board does not dispute petitioners' contention that the detentions and beatings

resulted from petitioners' refusal to join the Ba'ath Party, the Board stated:

Equally disturbing is the Board's finding that petitioners failed to show any characteristics in common with those who may have been persecuted for political activity in opposition to the Iraqi government. Petitioner Sarkis's brother, Doman Sarkis, testified at the exclusion hearing that a third Sarkis brother, whose full name does not appear in the record, was tortured to death by the Iraqui Army during his military service.[6]

Although the Board does advert to this testimony, it makes no attempt, in its opinion, to reconcile this dramatic testimony with its finding that petitioners have failed to demonstrate characteristics in common with individuals who have suffered politically motivated persecution in Iraq.[7] Rather, the Board concludes that petitioners have not shown that a decision by the Iraqi Government to inflict the death penalty

upon them for draft evasion would be influenced by petitioners' religion or political opinions.

Accepting the Board's *sangfroid* premise that uniform application of admittedly harsh penal laws constitutes prosecution and not persecution, I am, nevertheless, unable on this record to find substantial evidence supporting the Board's finding that possible infliction of the death penalty upon these petitioners for draft evasion would not be religiously or politically motivated. Moreover, for purposes of the asylum applications, I find that the Board's failure to adequately consider the testimony of Doman Sarkis (pertaining to the death by torture of the third Sarkis brother) constituted an abuse of discretion.

I note that the Board also concluded that petitioners failed to demonstrate that the performance of military service would be

---

The physical actions against the applicants, their brother and the other Iraqi witness at the time they refused to join the party were taken while they were students by their fellow students. Now that the applicants are out of school, they have not shown they will be subject to the conditions which led to the kidnapping and beatings they reported.

Record at p. 13. That finding, however, is unsupported by substantial evidence. Sarkis testified that he left high school because of pressure to join the party, and that he was imprisoned and beaten for eight days after leaving school and going to work. Record, at p. 166. Mourad also testified that he was beaten after leaving school. Record, at p. 180. Likewise, Mr. Al-Azzawi, who had also refused to join the Ba'ath Party, related certain reprisals that occurred after he had left school. Record, at pp. 201–02.

**6.** On cross-examination, Doman Sarkis testified as follows:

Q. Mr. Sarkis, why was your brother in the hospital, do you know?

A. Because he was in the army and they had given him a lot of hard time, they tortured him so he ran away. So, they beat him up and then he didn't feel well, we took him to the hospital and afterwards they took him back to prison and he died and we couldn't do anything about it.

. . . . .

Q. Mr. Sarkis, you testified that he was killed while he was in the hospital, is that correct?

A. Yes, from being beaten up he died.

Q. And the beatings occurred in the hospital, is that correct?

A. Then I was in the army too and I went to visit him after a week that he was in the hospital and they came as if to take care of him but he told me, don't leave me here. But we couldn't do anything about it because they were beating him up. We said this is the Government's decision, we can't do anything about it.

Q. You were actually physically present while he was being beaten, is that correct?

A. From being beaten up he was very scared. I saw him tied up to the chair and he told me that they had been beating him up.

Q. What type of hospital was this?

A. It's an army hospital.

Q. Mr. Sarkis, do you recall what the exact cause of death was?

A. The reason was because he ran away from the army and when we turned him back, they beat him up. Plus because he was a christian, don't forget he was christian.

Q. How long was he in the hospital for, Mr. Sarkis?

A. He didn't stay over two months.

Q. Mr. Sarkis, you testified that your brother was beaten by members of the Ba'ath Party, is that correct?

A. Yes.

Q. How did you know that they were members of the Ba'ath Party?

A. Because I was in the army and I know who is who. I knew then that they were the ones who controlled Iraq.

Record, at pp. 147–48.

**7.** Whether the alleged killing of the third Sarkis brother was politically motivated is, itself, an unresolved question of fact at this point.

contrary to their genuine political, religious or moral convictions, or contrary to valid reasons of conscience. The Board, however, based its conclusion principally upon its observation that "one of the applicants has a brother (the other applicant's uncle) who as an Armenian Christian is presently serving in the Iraqi army." Record, at p. 17. That observation, being only marginally relevant, does not constitute the type of substantial evidence necessary to support the Board's conclusion.

Lastly, the Government has argued that the denial of petitioners' applications was based, in part, upon the Immigration Judge's assessment of petitioners' credibility, and that such findings are not subject to review by the district courts. Nevertheless, a fair reading of the Board's opinion shows that petitioners' applications were not denied on general grounds of credibility, but on the specific grounds discussed above.

*Conclusion*

Because I find that the record does not contain substantial evidence to support the grounds upon which the Board based its denial of petitioners' applications for political asylum and withholding of deportation, and because I find that the Board abused its discretion by failing to adequately consider the testimony of Doman Sarkis concerning the death of the third Sarkis brother, I am remanding the case for the taking of further testimony on the issues discussed in this opinion and for further consideration by the Board.

If the record of such proceedings is not filed with this Court within 120 days of the filing of this order, the petitions for a writ of habeas corpus will be granted by a further order of this Court. Execution of the final order of deportation currently pending against petitioners is hereby stayed pending completion of the administrative proceedings on remand and any further consideration by this Court.

SO ORDERED.