Rene CARVAJAL–MUNOZ,
Petitioner-Appellant,

v.

IMMIGRATION AND NATURALIZA-
TION SERVICE, Respondent-Appel-
lee.

No. 83–1952.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 9, 1984.

Decided Sept. 12, 1984.

despite counsel's failure to respond to the mo-     tion to dismiss.

Joseph Minsky, Minsky & Feiertag, Chicago, Ill., for petitioner-appellant.

Hilary S. Molay, Office of Immigration Litigation, Civil Dept., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before CUMMINGS, Chief Judge, and WOOD and COFFEY, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Petitioner Rene Carvajal-Munoz, a 37-year-old native of Chile and a former citizen of Argentina,[1] seeks review of an order by the Board of Immigration Appeals ("BIA") denying his application for asylum under section 208 of the Immigration and Nationality Act ("Immigration Act"), 8 U.S.C. § 1158 (1982), and his application for temporary withholding of deportation under section 243(h) of the Immigration Act, 8 U.S.C. § 1253(h) (1982). At the time of his last entry into the United States on June 12, 1979, near Del Rio, Texas, petitioner was a citizen of Argentina. Because petitioner entered the country as an alien without an immigration visa and without inspection by an immigration officer, the Immigration and Naturalization Service ("INS") charged petitioner with deportability under section 241(a)(2) of the Immigration Act, 8 U.S.C. § 1251 (1982). At a deportation hearing occurring on September 25, 1980, and resumed on November 13, 1980, petitioner admitted the allegations in the order to show cause, except that regarding his citizenship, and conceded deportability. The immigration judge found him deportable based on these admissions, and denied his requests for asylum and withholding of deportation. The immigration judge concluded that petitioner had failed to establish a clear probability that his life or his freedom would be threatened in either Argentina or Chile, and gave petitioner thirty days to voluntarily depart the United States or thereafter be deported to Argentina. Petitioner's administrative appeal to the BIA, an agency of the Department of

---

1. Petitioner claims he is no longer a citizen of Argentina, based on his requested revocation of his Argentine citizenship in a letter to the Argentine government dated July 12, 1979.

Justice, was denied. Because we find that petitioner has not met his burden of establishing that he qualifies for asylum or withholding of deportation, we affirm the BIA's order.[2]

## I.

The Immigration Act provides two procedural paths by which deportable aliens presently within the United States may remain here to avoid persecution in another country on account of race, religion, nationality, membership in a particular social group, or political opinion. Petitioner invoked both of these paths. The first path is to apply for a grant of asylum pursuant to section 208 of the Immigration Act, 8 U.S.C. § 1158 (1982), which may be done at any time, including during or after deportation proceedings. The second route is to apply for a temporary withholding of deportation pursuant to section 243(h) of the Immigration Act, 8 U.S.C. § 1253(h) (1982), once the alien has been found deportable and a country of deportation has been designated. Although the two paths are closely related and appear to overlap, they involve different procedures, provide different forms of relief, and place different burdens of proof on the alien. In addition, asylum relief is discretionary, while depor-

tation relief, which protects against deportation to a *specific* country, must be granted to qualified applicants.

Asylum claims were formerly outside the jurisdiction of an immigration judge, but an alien may now have both forms of relief considered by an immigration judge in a deportation proceeding. Requests for the two types of relief, however, should be treated separately. The BIA has stated that "[a]s we have only quite recently acquired jurisdiction over asylum claims, we are only just now beginning to resolve some of the problems caused by this addition to our jurisdiction, including the problem of determining exactly how withholding of deportation and asylum are to fit together." *In re Lam,* Interim Dec. No. 2857, slip op. at 6 n. 4 (BIA Mar. 24, 1981). To further clarify and resolve some of the problems relating to the two provisions, we begin by describing them in more detail.

A. *Applications for Asylum under Section 208.*

With the enactment of the Refugee Act of 1980 ("Refugee Act"), Pub.L. 96-212, 94 Stat. 102, Congress for the first time established a provision in federal law specifically relating to requests for asylum.[3] Section

---

**2.** We review the Board's decision in light of the circumstances existing when the decision was made. *Cf. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 554–55, 98 S.Ct. 1197, 1217, 55 L.Ed.2d 460 (1978). We note, however, that the political situation in Argentina has dramatically improved since petitioner made his request for asylum. *See, e.g.,* Schumacher, *Defending Argentina's New Democracy,* N.Y. Times Mag., June 10, 1984, at 26.

**3.** Prior to passage of the Refugee Act, no specific statutory basis for United States asylum policy existed with respect to aliens already in this country. Provisions governing the admission of aliens seeking asylum who were not in this country were set forth in section 203(a)(7) of the Immigration Act, 8 U.S.C. § 1153(a)(7) (1976). This section was originally directed at refugees fleeing particular regions and particular kinds of regimes; the geographical and ideological restrictions were eliminated by the Refugee Act. Asylym procedures for aliens in this country and at its ports were governed by regulations promulgated in 1974 by the Attorney General under the authority of section 103 of

the Immigration Act, 8 U.S.C. § 1103 (1976), which granted the Attorney General authority to administer and enforce laws relating to immigration. The regulations allowed aliens to apply for asylum with the INS district director having jurisdiction over their place of residence or port of entry. *See* 8 C.F.R. § 108.1 (1977). If the asylum claim were advanced between issuance of a show cause order and commencement of the deportation hearing or during the hearing, the immigration judge was to suspend the deportation hearing until the district director had completed action on the asylum request. *See* INS Operations Instructions 108.-1(f)(1) & (2). In the asylum hearing, the regulations provided that the district director could approve or deny the asylum application in the exercise of his or her discretion, and the decision could not be administratively appealed. *See* 8 C.F.R. § 108.2 (1978). It was held that, at least with respect to asylum decisions made by the district directors, no direct appeal lay with the courts of appeals under section 106 of the Immigration Act, 8 U.S.C. § 1105a(a), which vests in the courts of appeals exclusive jurisdiction over all final orders of deportation made

201(b) of the Refugee Act created a new section 208 of the Immigration Act directing the Attorney General to

establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 101(a)(42)(A) of this title.

8 U.S.C. § 1158(a) (1982). Section 101(a)(42)(A) of the Immigration Act defines a refugee as

any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A) (1982).

As the Supreme Court noted in *INS v. Stevic,* —— U.S. ——, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984), however, "[m]eeting the definition of refugee ... does *not* entitle the alien to asylum—the decision to grant a particular application rests in the discretion of the Attorney General under § 208(a)," 8 U.S.C. § 1158(a) (1982). *Id.* at 2497 n. 18. The discretion vested in the Attorney General is delegated to the district director having jurisdiction over the alien's port of entry or, if he or she is already in the United States, the alien's place of residence, *unless* an alien has been served with notice of referral to exclusion

proceedings or served an order to show cause for deportation proceedings. In these circumstances, exclusive jurisdiction over an asylum application lies with the immigration judge handling the exclusion or deportation proceeding. *See* 8 C.F.R. § 208.1 (1984). Even if the district director denies an application for asylum made before the institution of exclusion or deportation proceedings, the applicant may renew his or her request for asylum before the immigration judge in subsequent exclusion or deportation proceedings. Thus, "an alien who wishes to apply for asylum can get two bites at the apple ...." *Jean v. Nelson,* 727 F.2d 957, 981 (11th Cir.1984) (en banc). Hearings before either the district director or immigration judge on an asylum application are to be made only after the Bureau of Human Rights and Humanitarian Affairs ("BHRHA") of the Department of State has given an advisory opinion, which is to be made part of the hearing record. *See* 8 C.F.R. §§ 208.7, 208.8(d), 208.10(b) (1984). The burden is on the asylum applicant

to establish that he/she is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of the country of such person's nationality or, in the case of a person having no nationality, the country in which such person habitually resided, because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 C.F.R. § 208.5 (1984).

The regulations specify six situations in which the district director must deny asylum status, *see* 8 C.F.R. § 208.8(f)(i)–(vi) (1984),[4] and provide for no administrative

---

pursuant to 8 U.S.C. § 1252(b). *See Fleurinor v. INS,* 585 F.2d 129, 135–36 & n. 5 (5th Cir.1978). The regulations were amended in 1979, however, to give authority to immigration judges and the BIA to consider asylum applications made after the commencement or completion of deportation proceedings. *See* 44 Fed.Reg. 21,-253, Apr. 10, 1979 (effective May 10, 1979).

**4.**     (f) *Denial*—(1) *General.* The district director shall deny a request for asylum or extension of asylum status if it is determined that the alien:

(i) Is not a refugee within the meaning of section 101(a)(42) of the Act;

(ii) Has been firmly resettled in a foreign country;

appeals from the district director's decisions, *see* 8 C.F.R. § 208.8(c) (1984). In contrast, the regulations do not specify how an immigration judge is to make asylum decisions and contain no prohibition on the administrative review of those decisions. The BIA has indicated, however, that it will use the regulations addressed to the district director as "useful guidelines" in the exercise of the Board's own discretion over asylum requests. *See In re Salim*, Interim Dec. No. 2922, slip op. at 7 (BIA Dec. 29, 1982).

If the immigration judge grants an asylum request, it is for a period of one year. *See* 8 C.F.R. § 208.10(e) (1984). Thereafter, the applicant is interviewed annually to determine continuing eligibility for asylum or adjustment of status, which may include becoming a permanent resident. If the immigration judge denies asylum, the exclusion or deportation proceeding is to be reinstituted. *See* 8 C.F.R. § 208.10(f) (1984).

■ It is unclear whether we may directly review asylum decisions made by immigration judges in the context of deportation proceedings. Neither party has addressed the issue; both concluded that we had jurisdiction, although it appears to be a question of first impression.[5] We conclude that while asylum decisions by district directors may not be directly reviewed by the courts of appeals under the jurisdictional statute, section 106 of the Immigration Act, 8 U.S.C. § 1105a(a) (1982), *see Fleurinor v. INS*, 585 F.2d 129, 135–36 (5th Cir.1978), asylum decisions made by immigration judges and reviewed by the BIA are subject to our direct review.

Jurisdiction to review "all final orders of deportation ... made against aliens within the United States pursuant to administrative proceedings under [8 U.S.C. § 1252(b)]" lies exclusively in the courts of appeals. 8 U.S.C. § 1105a(a) (1982). The Supreme Court has held that, in order to minimize multiple review, the term "final orders of deportation" should be read to include not only the actual order of deportation, but all orders closely related to the deportation proceeding conducted pursuant to 8 U.S.C. § 1252(b) and entered during the proceeding, such as an order denying voluntary departure or an adjustment of status. *See Foti v. INS*, 375 U.S. 217, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963); *see also Giova v. Rosenberg*, 379 U.S. 18, 85 S.Ct. 156, 13 L.Ed.2d 90 (1964) (per curiam). Ancillary determinations made outside the context of a proceeding under 8 U.S.C. § 1252(b), however, such as granting a stay of deportation, are not subject to direct review. Only matters " 'intimately associated and immediately associated' " with the final order or "governed by the regulations applicable to the deportation proceeding itself, and ... ordinarily presented to the special inquiry officer [immigration judge] who entered the deportation order" fall within the ambit of direct appellate review. *Cheng Fan Kwok v. INS*, 392 U.S. 206, 217, 88 S.Ct. 1970, 1976, 20 L.Ed.2d 1037 (1968).

While we agree with the Fifth Circuit's decision in *Fleurinor* that asylum decisions made by the district directors are not di-

---

(iii) That the alien ordered, incited, assisted or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular group, or political opinion;
(iv) The alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;
(v) There are serious reasons for considering that the alien has committed a serious non-political crime outside the United States prior to the arrival of the alien in the United States; or

(vi) There are reasonable grounds for regarding the alien as a danger to the security of the United States.
8 C.F.R. § 208.8(f)(i)-(vi) (1984).

5. In *Chavarria v. United States Department of Justice*, 722 F.2d 666 (11th Cir.1984), the court assumed that it had jurisdiction to review the BIA's decision regarding the petitioner's section 208 claim and his section 243(h) claim. *Id.* at 667, 669–70. The court, however, went on to discuss petitioner's section 243(h) request and the judicial standard of review for such claims, without specifically discussing the section 208 claim and whether it was reviewable.

rectly reviewable by this court because they are not decisions made during a proceeding conducted under 8 U.S.C. § 1252(b), *see* 585 F.2d at 135–36; *see also Haitian Refugee Center v. Smith,* 676 F.2d 1023, 1033, 1035 (5th Cir.1982), we see no problem with undertaking direct review of asylum decisions made by immigration judges in the context of deportation proceedings.[6] In *Foti,* the Supreme Court specifically recognized that changes in administrative regulations making certain decisions "an integral part of the deportation proceedings conducted by a special inquiry officer" (immigration judge) could bring such decisions, previously outside the scope of direct review by the courts of appeals, "within the reach of § 106(a)'s judicial review provisions." 375 U.S. at 230 n. 16, 84 S.Ct. at 314 n. 16. Similarly, the Court in *Kwok* quoted with approval excerpts from the legislative history of section 106(a) of the Immigration Act suggesting that there was " 'no reason why the Immigration Service could not change its regulations to permit contemporaneous court consideration of deportability and administrative application for relief.' " 392 U.S. at 214, 88 S.Ct. at 1975 (*quoting* 105 Cong.Rec. 12728, remarks of Rep. Moore). In light of these congressional interpretations of the scope of the jurisdictional statute, we see no reason why asylum decisions, made by the same immigration judge rendering the deportation decision and entered in the course of administrative proceedings conducted under 8 U.S.C. § 1252(b), are not subject to direct review by the courts of appeals. Although one might argue that section 208 requests are technically not part of the deportation proceeding itself, direct review of these claims by the courts of appeals when decided by an immigration judge and appealed along with the deportation order and a withholding of deportation

request promotes section 106's purpose of "preventing successive dilatory appeals to various federal courts ...." *Foti,* 375 U.S. at 226, 84 S.Ct. at 312.

■ Since we conclude that section 106 of the Immigration Act allows us to review directly section 208 asylum decisions made by immigration judges in the context of deportation proceedings, our review is to be based "solely upon the administrative record upon which the ... order is based and the ... findings of fact, if supported by reasonable, substantial, and probative evidence on the record as a whole, shall be conclusive ...." 8 U.S.C. § 1105a(a)(4) (1982). The granting of asylum, however, is discretionary under section 208,[7] and ordinarily such a decision will be upheld unless it is found to be arbitrary, or capricious, or an abuse of discretion. We note, however, that the exercise of that discretion comes into play only after there has been a preliminary appraisal of refugee status, which involves an issue of fact. Because the abuse of discretion standard is not appropriate for reviewing factual findings regarding eligibility, *see Lee v. INS,* 541 F.2d 1383, 1385 (9th Cir.1976) (citing *Foti,* 375 U.S. at 228–29, 84 S.Ct. at 313–14), we hold that substantial evidence must support the finding regarding refugee status. *See Sarkis v. Nelson,* 585 F.Supp. 235, 237–38 (E.D.N.Y.1984) (relying on dictum in *Chun v. Sava,* 708 F.2d 869 (2d Cir.1983), to hold that "where the Board denies political asylum not as a matter of discretion, but as a result of its factual determination that petitioners have not demonstrated a well-founded fear of persecution, its determination must be supported by substantial evidence"). However, if the immigration judge finds that the applicant qualifies as a "refugee," but nonetheless decides to deny the applicant asylum in the

---

**6.** Indeed, the court in *Fleurinor* observed that the proposed changes in the regulations allowing immigration judges to consider asylum requests made after the commencement of deportation proceedings might change the reviewability by the courts of appeals of asylum applications brought in that context. 585 F.2d at 135 n. 5.

**7.** As we noted earlier, even if an alien is found to be a refugee within the meaning of section 101(a)(42)(A) of the Immigration Act, the immigration judge may still refuse to grant asylum in the exercise of his or her discretion. *See Stevic,* 104 S.Ct. at 2497 n. 18.

exercise of the judge's discretion, we will not overturn the decision unless it was arbitrary, capricious, or an abuse of discretion.

### B. *Applications for Withholding of Deportation under Section 243(h).*

Once an immigration judge finds an alien deportable in a deportation proceeding, a specific country is chosen or designated as the country of deportation. The alien can avoid deportation to the designated country, however, by applying within ten days of the deportation order for a temporary withholding of deportation pursuant to section 243(h) of the Immigration Act, 8 U.S.C. § 1253(h) (1982). Prior to the passage of the Refugee Act, the withholding of deportation was at the discretion of the Attorney General. Under the amended version of section 243(h), however, the Attorney General, and hence the immigration judge whose powers derive from the Attorney General,

> shall not deport or return any alien (other than an alien described in section 241(a)(19)) to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1253(h)(1) (1982).[8]

The determination whether to grant a temporary withholding of deportation is made in a hearing described in 8 C.F.R. § 242.17(c) (1984). The burden is on the applicant to establish that he or she "would be subject to persecution" on account of one of the specified bases. *Id.* The regulations make no reference to the inclusion of any advisory opinion by the State Department as part of the record. A grant of relief under section 243(h) is merely a stay of deportation with respect to the specified country. Should "substantial changes occur in the country from which such relief is granted, or if, for other reasons, the grant should need to be reevaluated, the [INS] can move for reopening." *In re Lam*, Interim Dec. No. 2857, slip op. at 3 n. 2 (BIA Mar. 24, 1981).

That an alien has previously applied for asylum does not preclude the alien from requesting a withholding of exclusion or deportation, *see* 8 C.F.R. § 208.11 (1984); indeed, the regulations provide that applications filed with the immigration court after the exclusion or deportation proceedings "shall *also* be considered as requests" under section 243(h) for withholding deportation, 8 C.F.R. § 208.3(b) (1984) (emphasis added), thus eliminating the need for filing a separate request for section 243(h) relief if a section 208 application has been made.[9]

This provision is not anomalous, since there are situations in which an alien might prevail on a withholding of deportation request after he or she has failed on an asylum claim. For example, asylum could be denied if the alien comes within one of

---

**8.** This provision does not apply to any alien if the Attorney General determines that—

(A) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;

(B) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;

(C) there are serious reasons for considering that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States; or

(D) there are reasonable grounds for regarding the alien as a danger to the security of the United States.

8 U.S.C. § 1253(h)(2) (1982).

**9.** Section 243(h) relief, however, is not automatically also considered as a section 208 request under the regulations; in fact, an alien may be barred from asserting a section 208 request while still permitted to invoke section 243(h). For example, 8 C.F.R. § 208.11 (1984) provides that once a deportation proceeding has been concluded, an alien may request that an exclusion or deportation proceeding be reopened on the basis of a request for asylum. For the request to be considered, however, it "must reasonably explain the failure to request asylum prior to the completion of the exclusion or deportation proceeding." 8 C.F.R. § 208.11 (1984).

the undesirable groups described in section 243(h)(2) and 8 C.F.R. § 208.8(f)(1)(iii)–(vi) (1984), or if the alien has been firmly resettled in another country. *See* section 207(c)(1) of the Immigration Act, 8 U.S.C. § 1157(c)(1) (1982); 8 C.F.R. § 208.8(f)(1)(i) (1984); 8 C.F.R. § 208.14 (1984). In addition, as happened in one case, even though a decision was made that the alien would be subject to persecution if he or she were returned to the country of his or her nationality, the BIA denied asylum in its discretion because of the fraudulent circumstances under which the alien arrived in the United States, a circumvention sought to be discouraged. The alien was still able to prevent his deportation to his country of nationality, however, on the basis of section 243(h), since withholding of deportation is mandatory for qualified applicants. The alien was instead deported to another country. *See In re Salim*, Interim Dec. No. 2922 (BIA Sept. 29, 1982).

Because prior to the passage of the Refugee Act decisions regarding withholding of deportation were discretionary, we reviewed them under an arbitrary, or capricious, or an abuse of discretion standard. *See Lena v. INS*, 379 F.2d 536, 537 (7th Cir.1967); *see also Fleurinor*, 585 F.2d at 133. We agree with the majority of other circuits that have addressed the matter, however, that the statutory standard of review has now changed, since "the new mandatory language of section 243(h) justifies replacing the abuse-of-discretion standard with the substantial-evidence standard." *McMullen v. INS*, 658 F.2d 1312, 1316 (9th Cir.1981). *Accord Chavarria v. United States Department of Justice*, 722 F.2d 666, 670 (11th Cir.1984); *Reyes v. INS*, 693 F.2d 597, 600 (6th Cir.1982) (per curiam); *see also Sarkis v. Nelson*, 585 F.Supp. 235, 237 & n. 4 (E.D.N.Y.1984). *But see Marroquin-Manriquez v. INS*, 699 F.2d 129, 133 n. 5 (3d Cir.1983). The provision of the Immigration Act providing for our direct review of deportation orders, *see* 8 U.S.C. § 1105a(a)(4) (1982), provides that findings of fact are to be reviewed under the substantial evidence standard. Such a finding of fact is now required under the amended section 243(h), since the immigration judge must withhold deportation if certain facts exist. "This change requires judicial review of the Board's factual findings if the 1980 amendment to § 243(h) is to be given full effect." *McMullen*, 658 F.2d at 1316.

C. *Problems with the Overlap of Section 208 and 243(h) Requests in the Same Administrative Hearing.*

■ While the Justice Department, in promulgating the regulations relating to asylum and withholding of deportation requests, may have thought that it could eliminate duplication of proceedings and allow a more efficient and expeditious determination of an alien's rights by permitting immigration judges to decide asylum requests as well as conduct deportation proceedings and rule on applications for withholding of deportation, its decision in this regard has created several problems if these determinations are all made in the same hearing and on the basis of the same record. First, the factors that go into making an asylum decision are different from those involved in deciding a withholding of deportation request, not only because of the discretion permitted with asylum decisions, but because the content and focus of the hearings also differ. For example,

whether or not due process protections apply to an application for a discretionary grant of asylum, which secures admission to this country, *compare Jean v. Nelson* [727 F.2d 957 (11th Cir.1984) (en banc)] (no due process rights) *with id.* at [989] (Kravitch, J., dissenting) (some due process rights), it appears likely that some due process protection surrounds the determination of whether an alien has sufficiently shown that return to a particular country will jeopardize his life or freedom so as to invoke the mandatory prohibition against his return to that country.

*Augustin v. Sava*, 735 F.2d 32, 37 (2d Cir.1984); *see also Chun v. Sava*, 708 F.2d 869, 877 (2d Cir.1983). This difference is reflected in the fact that while asylum decisions are to be made only after considera-

tion of a State Department advisory opinion, *see* 8 C.F.R. § 208.10 (1984), there is no provision for consideration of such opinions in the withholding of a deportation hearing, *see* 8 C.F.R. § 242.17(c) (1984), and indeed, as we discuss later, due process problems may result if an immigration judge in a section 243(h) hearing relies too heavily on recommendations in the State Department's opinion regarding the likelihood of the particular applicant being persecuted. *See Zamora v. INS*, 534 F.2d 1055, 1059–63 (2d Cir.1976). An additional factor that may make it inappropriate to consider asylum and withholding of deportation requests in the same hearing is that our review of the administrative record is separate with respect to each, since our scope of review is different for each decision. We therefore suggest that immigration judges make asylum decisions, whenever possible, on a separate record and before the deportation hearing itself, and not along with a withholding of deportation decision, which is to take place after deportability has been determined and a country of deportation has been designated. If efficiency would be served by a combined hearing, however, such as by gathering all the testimony at one time, and one is conducted, then the immigration judge's decisions on the claims should set forth separately the specific administrative record on which each was made. Although neither of these procedures was followed in this case, we are able to uphold the decision based on the current record.

## II.

Petitioner's applications for asylum under section 208 and for withholding of deportation under section 243(h) were considered by the immigration judge in this case in the same hearing and on the same record. The INS order to show cause and notice of hearing were issued on December 12, 1979. Thereafter, petitioner filed Form I–589 with the immigration court, requesting asylum pursuant to section 208 of the Immigration Act. On June 10, 1980, the immigration judge forwarded petitioner's request for asylum to the State Department in accordance with 8 C.F.R. § 208.-10(b) (1984) (which had become effective eight days earlier, *see* 45 Fed.Reg. 37,394 (June 2, 1980)), which provides that when an asylum request is filed after the institution of deportation proceedings, the immigration judge shall request an advisory opinion from the BHRHA of the Department of State. In a letter dated July 25, 1980, the State Department expressed its view that petitioner had not established a well-founded fear of persecution upon return to Argentina.

Rather than first conduct a hearing on petitioner's asylum request, the immigration judge held a deportation hearing for petitioner on September 25, 1980. Petitioner appeared, and through counsel, responded to questions and conceded deportability. The immigration judge then asked whether petitioner wished to "renew" his application for asylum and if he wished "to be considered under section 243(h), as amended by the Refugee Act of 1980[.]" Counsel indicated that petitioner would, and these matters were adjourned until November 13, 1980.

At the hearing on November 13, 1980, petitioner declined to name either Argentina or Chile as a country to which he should be deported if an order were issued. On the recommendation of the INS trial attorney, the judge therefore designated Argentina, and proceeded with a hearing regarding petitioner's applications for asylum and withholding of deportation. At the hearing, the INS submitted, without objection from petitioner, a warrant of deportation entered against petitioner in 1977, and the advisory opinion of the State Department. In support of his claim that he would be persecuted in Argentina based on his birth in Chile, his past political activities, and his renunciation of his Argentine citizenship, petitioner offered into evidence four articles about general political conditions in Argentina[10] and testified about his alleged

---

**10.** The documentary evidence submitted by peti-    tioner included: (1) a letter renouncing his Ar-

past persecution by the Argentine police. In his testimony, petitioner stated that he was born in Chile but left the country in 1967 because he was a Christian Democrat and feared persecution by the communists. He alleged that he became an Argentine citizen in August, 1975, and then moved to Venezuela in 1977. He subsequently entered this country illegally and was arrested and deported to Argentina in late 1977.

Petitioner claimed that upon his return to Argentina after deportation, the Argentine police met him at the plane and accused him of being a terrorist. He testified that he was stripped, beaten, and held for several days. In February, 1978, he was arrested again when he was in the center zone of Buenos Aires discussing the government with friends. On this occasion he was allegedly detained for twenty days and told that, because he was Chilean, he had no right to participate in demonstrations in Argentina; he was warned not to express anti-government views in the future.

Although petitioner's original asylum application stated that he had been arrested only three to four times in 1978, and never in connection with a demonstration against the government, he testified at the hearing that he was harassed and arrested approximately ten times in connection with political discussions in the streets of Buenos Aires. He admitted that he never made any speeches during these gatherings and apparently was never singled out for arrest, but was always apprehended with a group of people. His last encounter with the Argentine police occurred in December, 1978. At that time, four policemen purportedly armed with machine guns came to his house, took him to police headquarters, and advised him to leave the country. Petitioner said he was given the impression that the police thought he was a Chilean

spy. He was released after a few hours, and several days later he left Argentina and traveled to the United States.

In a written decision dated January 15, 1981, the immigration judge denied petitioner's applications for asylum and withholding of deportation, but granted him the privilege of voluntary departure. In denying petitioner's requests, the immigration judge thoroughly discussed the evidence. He found that the published articles were not probative of the likelihood of petitioner being subjected to persecution upon deportation to Argentina, since all of the reports described general conditions in Argentina and did not mention petitioner specifically. The immigration judge observed that apart from petitioner's uncorroborated statements, petitioner had not presented any evidence demonstrating that the Argentine government had any current interest in him. Finally, the immigration judge found that petitioner had failed to present any evidence showing he had been persecuted in Chile or that he would be singled out for persecution were he forced to return there.

In his opinion, the immigration judge stated that to qualify for withholding of deportation under section 243(h), the applicant must show that, if deported, "he would be subject to persecution, and that to meet this burden, the petitioner must demonstrate a clear probability that he will be persecuted if returned to his country." "Similarly," the judge noted, "to qualify for asylum, an alien must show that he would be persecuted for one or more of the same five reasons mentioned ... in ... Section 243(h)." Because petitioner had "failed to establish that he would be persecuted if deported to Argentina or Chile," the immigration judge concluded that peti-

gentine citizenship, dated July 12, 1979; (2) a 1979 report from Amnesty International describing conditions in Argentina; (3) a 1980 report by the United States State Department, *Country Reports on Human Rights Practices for 1979* (Feb. 4, 1980), commenting on the state of human rights in Argentina; (4) a *Reader's Digest* article on human rights in Argentina; (5) a Presidential determination, No. 80–28, 45 Fed.

Reg. 68,365 (Oct. 15, 1980), made pursuant to section 101(a)(42)(b) of the Immigration Act, allowing "present and former political prisoners and their family members in Argentina" to be considered refugees of special humanitarian concern to the United States; (6) a petition signed by petitioner's friends, citizens of the United States, requesting that petitioner be granted asylum.

tioner's requests for asylum and withholding of deportation should be denied.

The decision was upheld by the BIA in an order issued on April 19, 1983. Based upon its review of the evidence presented by petitioner, the BIA concluded that he "failed to establish that he will be persecuted or that he has a well founded fear of persecution in Argentina within the meaning of section 208(a) or 243(h) of the Act." The Board further stated that "[our] conclusion as to [petitioner's] claim is the same whether we apply a standard of 'clear probability,' 'good reason,' or 'realistic likelihood.'" Petitioner was granted voluntary departure for a period of thirty days from the date of the order, and this appeal followed.

### III.

On appeal, petitioner argues that an applicant must establish only a "well-founded fear" of persecution for both asylum and withholding of deportation claims, that he has met this standard, and that the State Department advisory opinion was improperly considered by the immigration judge and the BIA. We begin by considering the

---

**11.** The Protocol essentially adopted the definition of "refugee" used in the 1951 Convention Relating to the Status of Refugees, 189 U.N.T.S. 150. Under Article 1.2 of the Protocol, a "refugee" is a person who, "owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular group or political opinion, is outside the country of his nationality ...." In addition, Article 33.1 provides that no party to the Protocol can "return a refugee ... to ... territories where his life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group or political opinion."

In *In re Dunbar*, 14 I. & N.Dec. 310 (BIA 1973), the BIA rejected the position that the Protocol effected "substantial changes in the application of section 243(h), either by way of burden of proof, coverage, or manner of arriving at decisions." *Id.* at 323. We took a similar position in *Kashani v. INS*, 547 F.2d 376 (1977), concluding that there was no substantial difference between "clear probability" and a "well founded fear," and that the two standards would "in practice converge." *Id.* at 379. Other courts of appeals appeared to reach essentially the same conclusion. *See generally Stevic*, 104 S.Ct. at 2496.

evidentiary burden petitioner must meet with respect to each request.

### A. *Evidentiary Burdens.*

#### 1. *Withholding of Deportation under Section 243(h).*

■ Prior to the enactment of the provisions of the Refugee Act amending section 243(h), legislation enacted by Congress through 1965, *see* 64 Stat. 1010; 66 Stat. 214; 79 Stat. 918, authorized the Attorney General to exercise his or her discretion and withhold deportation of an otherwise deportable alien if in the Attorney General's opinion the alien would be subjected to persecution in the country designated for the alien's deportation. It was generally accepted that for such discretion to be exercised, the alien had to show a "clear probability" of persecution. *See Lena v. INS*, 379 F.2d 536, 538 (7th Cir.1967). Despite some concerns that the "clear probability" standard may have been changed by the United States' 1968 accession to the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6257, T.I.A.S. No. 6577,[11] and by certain provisions of the Refugee Act,[12] this stan-

---

**12.** With the enactment of the Refugee Act, attention once again was focused on whether the standard an applicant must satisfy under section 243(h) was explicitly or implicitly changed. Section 203(e) of the Refugee Act amended the language of section 243(h) of the Immigration Act, basically conforming it to the language of the Protocol. The Refugee Act substituted "life or freedom would be threatened" for "persecution," and added "nationality" and "membership in a particular social group" to the list of categories under which an applicant can qualify for relief. In addition, the Refugee Act modified section 243(h) to *require* the Attorney General to withhold deportation if an alien can show that his "life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group or political opinion." 8 U.S.C. § 1253(h) (1982). Finally, a new section 208 dealing with asylum claims was added to the Immigration Act, discussed in detail *infra*. Under section 208, in order to be eligible for asylum, an alien must meet the definition of "refugee" contained in section 101(a)(42)(A), which includes any person who has a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (1982).

dard has been reaffirmed as the proper one for determining the applicant's burden under section 243(h). In *Stevic,* the Supreme Court analyzed our accession to the Protocol and the language and legislative history of the Refugee Act and concluded that Congress did not intend a "well-founded fear" standard—whatever substantive implications this standard might have—to be employed under section 243(h). It found that "the 'clear probability of persecution' standard remains applicable to § 243(h) withholding of deportation claims." *Id.* 104 S.Ct. at 2501.

In *Kashani v. INS,* 547 F.2d 376 (7th Cir.1977), we stated that under the "clear probability" standard, "objective evidence that the alien will be persecuted is necessary. The alien's own assertions, without corroboration, will not suffice." *Id.* at 379 (citation omitted). We recognized that while the evidentiary burden is not an easy one, an applicant at a minimum has to provide *specific facts* regarding the applicant's conduct and contentions. *See id.* at 380. Statements of belief are insufficient, *see Pereira-Diaz v. INS,* 551 F.2d 1149, 1154 (9th Cir.1977), and the evidence must establish that *this particular* applicant will more likely than not be singled out for persecution. *See Chavarria v. United States Department of Justice,* 722 F.2d 666, 670 (11th Cir.1984).

In reaffirming the "clear probability" standard in *Stevic,* the Court did not attempt to describe further what that standard requires. Justice Stevens wrote:

We have deliberately avoided any attempt to state the governing standard beyond noting that it requires that an application be supported by evidence establishing that it is *more likely than not that the alien would be subject to persecution on one of the specified grounds.* This standard is a familiar one to immigration authorities and reviewing courts, and Congress did not intend to alter it in 1980.

104 S.Ct. at 2501 (emphasis added).

2. *Asylum under Section 208.*

Section 208 provides for discretionary grants of asylum to those who qualify as refugees under section 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A) (1982), "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.; see also* 8 C.F.R. § 208.5 (1984). The Supreme Court in *Stevic* specifically left open "the meaning of the phrase 'well-founded fear of persecution' which is applicable by the terms of the [Immigration] Act and regulations to requests for discretionary asylum." 104 S.Ct. at 2501. The Court did note, however, that the refugee section incorporating the "well-founded fear" language "[was] intended ... [to] be construed consistently with the Protocol...." *Stevic,* 104 S.Ct. at 2499 (citations omitted). The Protocol, in turn, bound parties to comply with the substantive provision of Articles 2 through 34 of the United Nations Convention Relating to the Status of Refugees, whose diplomatic history reveals that "[t]he well-founded fear of being the victim of persecution for reasons of race, religion, nationality or political opinion means that a person has either been actually a victim of persecution or can show good reason why he fears persecution." United Nations Economic & Social Council, *Report of the Ad Hoc Committee on Statelessness and Related Problems* 39 (1950).

It was this language that we relied on in *Kashani* to observe that a well-founded fear of persecution "surely refers to more than the alien's subjective state of mind." 547 F.2d at 379. The issue in *Kashani,* decided before the enactment of the Refugee Act, was whether our accession to the Protocol shifted the inquiry under a section 243(h) request for discretionary relief entirely to an assessment of the applicant's subjective state of mind. We rejected this contention and stated that

an alien claiming a "well founded fear of persecution" must either demonstrate that he actually has been a victim of persecution or that his fear is more than a matter of his own conjecture. Our interpretation of "well founded" con-

forms ·with the understanding of the committee that drafted the definition of a refugee. *See* United Nations Economic and Social Council, *Report of the Ad Hoc Committee on Statelessness and Related Problems* 39 (February 17, 1950) (E/1618; E/AC 32/5).

This requirement can only be satisfied by objective evidence that the alien's assertions are correct.

547 F.2d at 379.

Although we predicted in *Kashani* that because of the objective evidence requirement the "well-founded fear" standard contained in the Protocol and the "clear probability" standard linked to section 243(h) "will in practice converge," *id.*, this was only a prediction made before the passage of the Refugee Act and does not express our view of the effect of that statute. We do believe, however, that *Kashani*, together with the United Nations committee report, correctly expresses the evidentiary burden an applicant must meet before he or she can be considered for asylum under section 208. *See also* United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status* ¶¶ 38, 42–43, 45 (Geneva 1950). The applicant must present *specific* facts establishing that he or she has actually been the victim of persecution or has some other good reason to fear that he or she will be *singled out* for persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. Ordinarily, this must be done through objective evidence ˙supporting the applicant's contentions. Sometimes, however, the applicant's own testimony will be all that is available regarding past persecution or the reasonable possibility [13] of persecution. In these situations, the applicant's uncorroborated testimony will be insufficient to meet the evidentiary burden unless it is credible, persuasive, and points to *specific* facts that give rise to an inference that the applicant has been or has a good reason to fear that he or she will be singled out for persecution on one of the specified grounds, or, alternatively or in addition thereto, must show through testimony and corroborative objective evidence that he or she has good reason to fear persecution on one of the specified grounds.

This standard conforms with the standard employed in assessing refugee admissions under the old section 207. Section 203(a)(7) of the Immigration Act, 8 U.S.C. § 1153(a)(7)(A)(i) (1976), authorized the Attorney General to permit "conditional entry" for immigrants fleeing from a Communist-dominated area or the Middle East "because of persecution or fear of persecution on account of race, religion, or political opinion." *See also* section 212(d)(5) of the Immigration Act, 8 U.S.C. § 1182(d)(5) (1976). Under the administrative practice relating to admissions under section 203(a)(7), the alien was required to establish through "credible testimony or other evidence that he was persecuted or had good reason to fear persecution." *In re Ugricic,* 14 I. & N. Dec. 384, 385–86 (Dist. Dir.1972).[14] This evidentiary burden is also consistent with what the majority in *Stevic* observed would be a moderate interpretation of the well-founded fear language: "that so long as an objective situation is established by the evidence, it need not be shown that the situation will probably result in persecution, but it is enough that persecution is a reasonable possibility." 104 S.Ct. 2498.[15] Although this evidentiary

---

**13.** *See infra* text accompanying note 15.

**14.** Section 203(a)(7) claims for asylum rested in the jurisdiction of the INS district directors. Neither immigration judges nor the BIA had jurisdiction over these claims.

**15.** The legislative history of section 208 is not particularly helpful in suggesting what the content of the "well-founded fear" standard is. The Senate Report states:

> As amended by the Committee, the bill establishes an asylum provision in the Immigration and Nationality Act for the first time by improving and clarifying the procedures for determining asylum claims filed by aliens who are physically present in the United States. The substantive standard is not changed; asylum will continue to be granted only to those who qualify under the terms of the United Nations Protocol Relating to the

575

burden is very similar to that connected with the "clear probability" standard, it is not identical. *But cf. Rejaie v. INS*, 691 F.2d 139, 146 (3d Cir.1982) (evidentiary burden under *section 243(h)* is the same whether standard is labeled "well-founded fear" or "clear probability" of persecution). This view comports well with the structure of the Immigration Act: establishing an *entitlement* to withholding of deportation under section 243(h) should require a greater evidentiary burden than establishing "refugee" status so as to be eligible for a *discretionary* grant of asylum under section 208.

B. *Record Evidence in this Case.*

In the present case, the BIA concluded that petitioner had "failed to establish, prima facie or otherwise, that he will be singled out for persecution in Argentina. Our conclusion as to [petitioner's] claim is the same whether we apply a standard of 'clear probability,' 'good reason,' or 'realistic likelihood.'" The Board therefore apparently assessed the evidence under both of the standards we have discussed, although it did not go into detail regarding the specific evidentiary burden connected with each of the two standards. After a careful review of that evidence, we agree that petitioner

---

Status of Refugees, to which the United States acceded in November 1969. S.Rep. No. 96–256, 96th Cong., 1st Sess. 9 (1979), *reprinted in* 1980 U.S.Code Cong. & Ad. News 141, 149.

The Senate Report's statement about the substantive standard not being changed is ambiguous, but appears to refer to whatever the standard is under "the terms of the United Nations Protocol." The "terms" of the Protocol, however, do not refer to "asylum"; rather, the relevant terms are the definition of "refugee" in Article 1, the prohibition in Article 33 against contracting states expelling or returning a refugee to a territory where his or her life or freedom would be threatened, and the precatory language of Article 34 urging the contracting states to facilitate as much as possible the assimilation and naturalization of refugees.

It appears from the House Report and the structure of the Immigration Act that the new section 208, unlike the amendments to section 243(h), was not so much directed at conforming to Article 33 and the standards relating to prevention of *deportation*, as to Article 34. H.R. Rep. No. 96–608, 96th Cong., 1st Sess. 17–18 (1979) ("H.R.Rep."). Under the Protocol, it was not the alien's status as a refugee that prevented deportation, but the existence of a threat to his life or freedom. *See* Article 33. Congress believed that the "clear probability" standard of section 243(h) withholding of deportation satisfied and conformed to this part of the Protocol. H.R.Rep. at 18. The new section 208, however, was apparently intended to be linked not to Article 33 and its standards, but to the refugee sections. The new section 208 of the Immigration Act was added in section 201 of the bill, the section dealing with refugees, and not section 203 of the bill, which amended section 243(h) of the Immigration Act. Section 201(b) of the bill created the new section 208, and section 201(a) of the bill provided a new expanded version of the United Nations Protocol definition of refugee and amended section 203(a)(7) of the Immigration Act to eliminate the geographical and

ideological restrictions that formerly applied to conditional entrant refugees. In order to be eligible for admission under section 207 or asylum under section 208, an alien must meet the definition of refugee contained in .section 101(a)(42)(A) of the Immigration Act. As the Supreme Court noted in *Stevic*, "[t]he primary substantive change Congress intended to make under the Refugee Act ... was to eliminate the piecemeal approach to *admission* of refugees previously existing under § 203(a)(7) and § 212(d)(5) of the Immigration and Nationality Act, and § 108 of the regulations, and to establish a systematic scheme for admission and resettlement of refugees." *Stevic*, 104 S.Ct. at 2498–99. In doing so, "[t]he Congress distinguished between discretionary grants of refugee admission or asylum and the entitlement to a withholding of deportation if the § 243(h) standard was met," *id.* at 2499, and "understood that refugee status alone did not require withholding of deportation, but rather, the alien had to satisfy the standard under § 243(h) ...," *id.* at 2500.

Finally, we note that the old regulations that preceded the new section 208 are not particularly helpful in illuminating what the evidentiary burden under section 208 is to be. When the old regulations were first established in 1974, *see supra* note 3, the Notice of Proposed Rulemaking did not elaborate on why these regulations were being adopted, other than that they were "to incorporate into the regulations procedures for making application for asylum in the United States and for the adjudication of such applications ...." 39 Fed.Reg. 28,439 (Aug. 7, 1974). The regulations permitted the district director to approve or deny the application for asylum in the exercise of his discretion, but did not explicitly adopt a standard for the exercise of that discretion. In 1979, shortly before passage of the Refugee Act, immigration judges were given jurisdiction over asylum applications filed after the commencement of deportation proceedings. *See* 8 C.F.R. § 108.1 (1980). Again, no standard was specified.

has failed to meet the evidentiary burdens we have just described.

Before we review the evidence in some detail, we first deal briefly with petitioner's claim that the consideration of the State Department's advisory opinion by the immigration judge and the BIA in this case raises problems of fair procedure. As we noted earlier, one problem with considering section 208 asylum claims and section 243(h) requests in the same hearing on the same record evidence is that the factors to be considered with respect to each are somewhat different, and that while the regulations require an advisory opinion from the State Department as part of the record for an asylum hearing, they do not require that it be part of the record of a withholding of deportation hearing. *Compare* 8 C.F.R. § 208.10 (1984) *with* 8 C.F.R. § 242.-17(c) (1984). The Second Circuit has observed that the regulation requiring incorporation of recommendations from the State Department into the asylum hearing presents no "fairness" due process problems because, "apart from other reasons, resort to § 243(h) remains open, and that provision makes a hearing procedure available." *Zamora*, 534 F.2d at 1059.[16] The court cautioned, however, that admitting these same advisory opinions in a section 243(h) hearing presents the "risk that such communications will carry a weight they do not deserve" and thus impair the fairness of the hearing when the State Department opinion suggests the outcome of a particular case. *Id.* at 1063. It concluded that although State Department advisory opinions are relevant and thus admissible in section 243(h) hearings, their use should be limited to elucidating the extent to which

the nation of prospective deportation engages in persecution on any of the specified grounds and should reveal, as far as possible, the basis of the views expressed, but should "not attempt to apply this knowledge to the particular case...." *Id.* at 1062. *See also In re Francois*, 15 I. & N.Dec. 534, 535–36 (BIA 1975).

■ The advisory opinion in this case was not so limited. It included a specific recommendation by the State Department about the likelihood of petitioner himself being subject to persecution if he were deported to Argentina. We conclude, however, that the inclusion of the advisory opinion as part of the section 243(h) hearing was not reversible error.[17] Petitioner's own evidence, even without consideration of the advisory opinion, failed to satisfy his burden with respect to either claim. *See, e.g., Paul v. INS*, 521 F.2d 194, 200 (5th Cir.1975).

■ We believe that the Board's conclusion that petitioner failed to establish a "well-founded fear" of persecution is supported by substantial evidence. That being so, petitioner also fails under the heavier "clear probability" standard of section 243(h). As we stated earlier, for an applicant to meet the burden of establishing a "well-founded fear" of persecution so as to be eligible for a discretionary grant of asylum under section 208, the applicant must present *specific* facts through objective evidence if possible, or through his or her own persuasive, credible testimony, showing actual persecution or detailing some other good reason to fear persecution on one of the specified grounds. Although this is a

---

16. The purpose in admitting the advisory opinion of the State Department into evidence at a hearing on an asylum claim is three-fold: (1) to establish compliance with the regulatory requirement of 8 C.F.R. § 208.10(b); (2) to bring forth any information available to the State Department which supports the applicant's claim; and (3) to indicate the State Department's opinion regarding the likelihood of persecution given the specific facts presented by the applicant.
*In re Exilus*, Interim Dec. No. 2914, slip op. at 4 (BIA Aug. 8, 1982).

17. Petitioner failed to object to the admission of the advisory opinion, but this failure to object cannot be seriously faulted. The immigration judge considered the section 243(h) claim and the section 208 claim together in the same hearing, and regulations clearly require that an advisory opinion be obtained and considered by the immigration judge as part of the record of a section 208 hearing. *See* 8 C.F.R. § 208.10(b) (1984).

close case, petitioner falls short of meeting this evidentiary burden.

The only objective evidence presented by petitioner consisted of reports describing general conditions in Argentina. *See supra* note 10. None of the documents referred to petitioner specifically. Such general information is insufficient by itself to establish a claim of persecution; there must be specific circumstances giving rise to a reasonable possibility that *this* petitioner will be persecuted to qualify under section 208. *Cf. Chavarria v. United States Department of Justice*, 722 F.2d 666, 670 (11th Cir.1984) (section 243(h) claim). Except for one item of information, noted *infra* at note 20, these documents failed to substantiate that the Argentine government would have any particular interest in petitioner or a group to which petitioner belonged.

Because petitioner's objective evidence did not present facts giving rise to an inference that he had good reason to fear persecution, his testimony at the hearing and his statements in the asylum application become critical. As we noted earlier, when objective, corroborative evidence does not exist, petitioner's testimony must describe credibly and persuasively *specific, detailed* facts that demonstrate actual persecution on one of the specified grounds or give rise to an inference that some other good reason exists for petitioner to fear persecution on one of those grounds. We think that petitioner's claim falls short because his statements disclose insufficient *specific, detailed* facts to support it.

In support of his claim that he would be persecuted in Argentina based on his birth in Chile, his past political activities, and his

renunciation of his Argentine citizenship, petitioner described in his asylum application and testified at the hearing to his alleged persecution by Argentine authorities through arrests in 1977 and 1978. The immigration judge made no specific statement regarding petitioner's credibility. Thus, while recognizing the potential for self-serving statements in this context, we accept petitioner's statements where they establish factual circumstances with specificity, are not speculative, and do not conflict with petitioner's other evidence.

The factual circumstances relating to petitioner's arrests in our view fall short of demonstrating that petitioner was persecuted because of his political beliefs or his Chilean background or that he has some other good reason to fear persecution on those grounds. As for petitioner's arrest in December of 1977, we agree with the Board that the circumstances relating to this incident do not suggest that he was detained for any reason other than his having been deported from the United States. Similarly, the reasons for petitioner's arrests in 1978 remain vague and do not lead us to believe they were motivated by petitioner's political beliefs or Chilean background. In his application for asylum, petitioner stated that he had "been arrested 3–4 times during 1978 by the Argentine Police." Petitioner did not offer reasons for these arrests in his application, but noted that he had "never been arrested" for demonstrating against the military government.[18] During the hearing, however, petitioner alleged that he was arrested about ten times in connection with political discussions in the streets. The testimony relating to these incidents was vague;[19]

---

**18.** It was largely on this basis that the State Department advised that petitioner not be granted asylum:

*Reason:* The applicant fails to explain why he was arrested "3–4 times during 1978 by the Argentine Police" and kept in jail for varying times up to one month. Since he later states, however, that he was never arrested because of his participation in demonstrations against the Government, we are left with the feeling that the arrests he did experience must have been for some type of petty criminal activity

or other misconduct. His letter "renouncing" his Argentine citizenship also implies the arrests may have been for vagrancy or something of that sort. There is, in any event, no indication that he has been persecuted for either religious or political reasons as he contends.

**19.** Petitioner gave almost no specific information about these arrests. Petitioner first stated that "[t]hey would accuse me of being a bank robber, an activist, and I thought they were

only his testimony about his second arrest was more specific. That arrest occurred in February of 1978 when petitioner was discussing politics with friends in the center zone of Buenos Aires. Petitioner testified that he was told by the police that he could not participate in any demonstration because he was Chilean.[20]

This claim, if sufficiently substantiated, would establish persecution on account of nationality. But the claim was not adequately supported by other specific facts that petitioner should have established. First, although it is not entirely clear from petitioner's testimony if others were arrested with him in connection with the February, 1978, street gathering and those subsequent to it, a fair reading of his testimony does suggest that others were arrested as well. If so, then this would undercut his claim that he was singled out because of his Chilean background. If his Argentine friends were in fact left untouched, then this important fact should have been brought out by petitioner. Not only did petitioner not testify to these specifics, but he also failed to supply either affidavits from his friends who participated in the demonstrations with him regarding the events that transpired, or at least their names and addresses. Such information is critical if the veracity of petitioner's claims are to be checked by the INS through the

State Department or the embassy in Argentina. *See Kashani*, 547 F.2d at 380. In fact petitioner was asked in item 18 of the supplementary questionnaire to his application for asylum to give information regarding any of his arrests with dates, the exact location of incidents, who took such actions and why, the government authorities responsible, and the names and addresses of any witnesses. No such information was supplied by petitioner.

The lack of this information also undercuts the possibility that the arrest in February or the subsequent arrests occurred because of petitioner's political beliefs. Petitioner's statements and his description of events are simply not detailed enough to give rise to an inference that he was arrested on these occasions because of his political beliefs. Petitioner wrote in his asylum application that he never belonged to any organization hostile to the Chilean government. Although petitioner testified that he occasionally distributed pamphlets in the Argentine schools criticizing the military government, he did not point to any specific facts suggesting that the police were aware of these activities. On the occasions when he did distribute pamphlets, petitioner testified that he never gave speeches against the government. In addition, petitioner stated that during the times he was arrested in the center zone of Buenos

---

chiding me." Further questioning produced the following exchange:

> [Mr. Minskey, attorney for petitioner]: How many of those ten arrests took place while you were meeting with friends in these gatherings or where other people were gathering in the streets in Argentina?
> [Petitioner]: Well, I don't recall exactly. I couldn't say.
> [Mr. Minsky]: Did all of them take place while they were at such gatherings or meetings?
> Miss Gordon [Trial attorney for the INS]: Objection. Leading question.
> Immigration Judge: That's all right. I'll let him ask it. Go ahead.
> Mr. Minsky (continuing): Did all of them take place at such gatherings while you were meeting in these—in the streets with these people?
> [Petitioner]: Yes. In relation to the demonstrations. Yes.
> Immigration Judge To [Petitioner]: Now, why did you just say that you couldn't remember how many times out of all of these ten times

that you were a participant in a demonstration with other people? Now when your attorney says, "was it in all of them[?]," you say "yes."
> [Petitioner]: Well, of course, you know I'm a little confused, and I don't recall exactly everything you ask me.
> [Immigration Judge]: Well, he asked you before, how many times. You said you couldn't recall. Then he said was it every time. You said yes. It seems to me that you could have answered every time in the first place, if that were the fact.

20. The 1979 Amnesty International Report did note that "[s]ince the last months of 1978 there has been a conflict between Argentina and Chile about the Beagle Channel. As a result of this conflict, which almost led to warfare, a number of Chileans living in Argentina have been harassed and placed in detention."

Aires, he was just "conversing or talking" with his friends and was not making a speech or yelling. He speculated that an infiltrator overheard their discussions and tipped off the police. But the specific facts, suggest that petitioner was arrested for no other reason than his general participation in a street gathering, not because of his political beliefs. Again, petitioner's failure to supply more specific details of his arrests, or corroborate his contentions through affidavits solicited from his friends or possibly even his family (petitioner's mother and brother reside in Argentina), or at least supply the names and addresses of potential witnesses, make this case much less persuasive.

Finally, petitioner testified that Argentine authorities gave him the "impression" that he was detained at police headquarters on December 20, 1978, because he was a Chilean spy. Petitioner's own "impressions," however, will not suffice. His testimony does not point to any specific conduct by the police that reveals their motivations or gives rise to an inference that the detention was undertaken on account of his Chilean background or his political beliefs. Similarly, his belief that he may be persecuted because of his renunciation of his Argentine citizenship is not substantiated by any other evidence and by itself is unpersuasive.

We believe petitioner's evidence, viewed as a whole, falls short of that required to establish a "well-founded fear" of persecution so as to be eligible for section 208 relief, and consequently also falls short of establishing that he would "likely" be persecuted so as to be entitled to section 243(h) relief. His testimony was simply insufficiently corroborated and suffered from inconsistencies and lack of detail.

Petitioner argues, however, that the applicant in *Reyes v. INS*, 693 F.2d 597 (6th Cir.1982), was granted a withholding of deportation on evidence much less persuasive than petitioner offered here. In *Reyes*, the applicant sought withholding of deportation from the Philippines, claiming that if she were returned there she would be persecuted because of her political beliefs. The evidence submitted by the applicant in *Reyes* consisted of the applicant's testimony regarding her history of trouble she had with school officials, allegedly because of her anti-government activities; several articles describing the lack of human rights in the Philippines; the affidavits of two persons concerning their trips to the Philippines and the general tenor of the Philippine society; a letter by the director of mass media for the Catholic church in the Philippines describing particular incidents of persecution and violence against others, and advising the applicant not to return to the Philippines; and another letter from someone in the Philippines describing the conditions there in some detail.

We recognize that the decision in *Reyes* is not easily reconciled with our result here. We note, however, that the applicant in *Reyes* did obtain statements from persons describing conditions in the Philippines who were familiar with the applicant's attitudes and political beliefs first-hand. In addition, the court in *Reyes* applied a "well-founded fear" standard to the section 243(h) claim— an approach rejected by the Supreme Court in *Stevic*—without articulating the elements of that standard in more detail. The court simply noted that "something less" was required under the "well-founded fear" standard than the showing for "clear probability." In contrast, we have undertaken to define the evidentiary burden connected with the "well-founded fear" standard more fully. Relying on our approach to section 243(h) claims in *Kashani* and its discussion of the "well-founded fear" standard, we have insisted that objective evidence be offered whenever possible, but have recognized that obtaining objective evidence will often be difficult. When objective evidence does not exist, we have stated that the applicant's own testimony must set forth *specific facts that give rise to an inference that the applicant was persecuted or has some other good reason to fear persecution on one of the specified grounds.*

We do not believe that burden will be unduly onerous if the applicant garners all the facts available and presents them in a credible, persuasive manner. No matter how much some may regard this country as an unlimited safe harbor for homeless refugees, Congress has recognized that certain limitations must exist, and that this country can only accommodate so many immigrants in a given time period. It has defined the conditions and standards under which immigrants seeking asylum may enter or remain in this country. We have attempted to be fair in giving meaning to these standards. However, because we believe petitioner failed to meet the standards, we affirm the order of the Board of Immigration Appeals.

AFFIRMED.