## UNITED STATES v. DRISCOLL.
### No. 5534.

Circuit Court of Appeals, Seventh Circuit.
Nov. 27, 1935.

Will G. Beardslee, Director, Bureau of War Risk Litigation, of Washington, D. C., James R. Fleming, U. S. Atty., of Fort Wayne, Ind., Luther M. Swygert, Asst. U. S. Atty., of Hammond, Ind., and J. Gregory Bruce, Atty., Department of Justice, and Thomas E. Walsh, both of Washington, D. C., for the United States.

Clarence E. Benadum, of Muncie, Ind., for appellee.

Before SPARKS and ALSCHULER, Circuit Judges, and BALTZELL, District Judge.

SPARKS, Circuit Judge.

By this action appellee sought to recover total, permanent disability benefits under a contract of War Risk Term Insurance. He secured a verdict at the hands of the jury, and the sole question presented is whether he became totally and permanently disabled prior to May 31, 1919.

The evidence discloses that appellee enlisted on March 27, 1918. In May, 1918, he was confined for five weeks in a tuberculosis ward in the Base Hospital at Camp Sherman. He then went overseas and on October 9, 1918, he was slightly wounded by a cut over the eye. He was given first aid treatment by a comrade and went on. That afternoon while digging in, a shell burst over him and rendered him unconscious, and when he regained consciousness he was in a Base Hospital. In the meantime, he had first been taken to the first aid station where some slight wounds were dressed. From there he was transferred to an evacuation hospital, and from there to a Base Hospital. After three weeks he went back to his division and was preparing to go to the Sedan front, but on account of weakness the captain sent him back to the hospital. From there he was transferred to a rest camp, where he remained until the middle of January, 1919. He was then transferred to La Mons for debarkation, and left France on April 1, 1919, being honorably discharged April 25, 1919, at Camp Sherman.

After a week's rest he resumed his old employment in a cigar factory at St. Marys, Ohio, where he worked from May 10 to July 26, 1919, receiving therefor a total of $91.32. He said he fared pretty well there for two weeks, but found the air foul. This caused him to feel "tough" and he developed throat trouble and lost his voice. His physician advised him to change employment. He secured employment at a wheel and spoke factory, where he worked intermittently from July 29 to October 28, 1919, receiving $162.55. He then "loafed" until January 17, 1920, when he returned to the cigar factory where he

skinned tobacco intermittently, working one to three days a week, and from three to six hours a day, until July 17, 1920, receiving $416.18. He did no work during the week ending June 25. At this time he said he was in poor physical condition; that he was suffering with chronic laryngitis, arthritis and anemia, and that his nervousness had just begun to manifest itself in a major degree.

From October 16, 1920, to March 5, 1921, he worked at the cigar factory, for which he received wages of $252.91, but he did no work during the weeks ending January 15, February 12, and February 19.

From October 8, 1921, to January 20, 1923, he worked at the cigar factory, with the exception of three months from March 11 to June 10, 1922, and excepting also the week ending October 15, 1921. For this period he received wages of $583.28.

During the spring of 1923 he worked three weeks at a restaurant in Muncie, twelve hours a day, for which he received $10 a week and his board.

From March 27 to April 3, 1923, he worked for the wheel and spoke factory and received as wages $18.75.

For the week ending April 20, 1923, he worked at the cigar factory and received $7.20, and from February 27 to March 19, 1924, he worked at the Indiana Steel & Wire Company at Muncie, for which he received $95.80. Here he worked at night, sixty-two and a half hours a week at 40 cents an hour.

From May to September, 1924, he was employed by the Griffith Furniture Company at Muncie, for which he received $264. He could not do the heavy work to which he was first assigned and was changed to lighter work. He was off about one-fourth of the time, and was finally discharged because he was unable to do the work.

In 1925 he worked as a bottle sorter about three weeks for the Hemingray Glass Company, and on the last day of his employment he collapsed at his work. Here he worked twelve hours a day and received as wages 37½ cents an hour.

From November, 1925, to November, 1926, he worked intermittently for about sixty days selling from door to door, rugs at one time, and household articles at another, for which he netted about $2.50 a day in the sale of rugs, and about $1 a day in the sale of household articles.

The record discloses that appellee was in the government hospital at Dayton, Ohio, for about ninety days beginning July 27, 1925, and for about the same length of time he was in the hospital at Camp Custer, Michigan, beginning May 10, 1929, or 1930, and for a like period in 1931 he was hospitalized at Dwight, Illinois.

Appellee's medical testimony disclosed that in September, 1919, he was nervous, sad and morose, was below par generally and was affected with neurasthenia plus a slight anemia, which condition obtained in 1920, 1921 and 1923. His heart action was fast and he was "possibly a forty or fifty per cent man." The witness said that condition was permanent as such conditions are progressive and permanent, although in 1923 he had diagnosed appellee's disease as neurasthenia with "prognosis good." A report of an examination made on July 27, 1925, by Dr. McDonald disclosed the doctor's opinion that from a history of the case and the present findings he thought appellee had been suffering from chronic interstitial nephritis and chronic myocarditis which had existed for the past eighteen months. Another doctor said he had treated appellee for five or six years last past and considered him a neurasthenic, and that his condition was reasonably likely to be permanent. He could not say that he had any organic heart condition, nor could he say that he was permanently disabled in 1928, nor that any effort to perform work in a continuous manner would be injurious to his health, but he thought that arduous mental work, or work in a factory where there was dust and noise would render his disability permanent, in view of the history of his tubercular condition. Another of his physicians testified that he examined appellee on May 1, 1929, and found him nervous, undernourished, weak and suffering from a delusion and had to be restrained; that he obtained hospitalization for him with the Veterans' Bureau, and he did not suffer from hallucinations after his return. He thought appellee's condition was permanent.

Dr. Caylor stated that examinations made of appellee on February 18 and 25, and March 6, 1932, and January 24, 1933, revealed active pulmonary tuberculosis and osteoarthritis of the knees which was not fatal. He further stated that appellee was suffering from neurasthenia which apparently was not so pronounced as it had been previously; that his X-ray examination re-

vealed a marked induration of both lungs (growth of fibrous connected tissue with old pulmonary tuberculosis), and it further revealed active pulmonary tuberculosis in the left apex, and the presence of calcified areas on the knee joint, particularly the femur. It was his opinion that appellee's disability was permanent and had been present for a number of years, although he did not state definitely the length of time. Dr. Nichol testified substantially the same as Dr. Caylor. There was further testimony by one or more of the medical witnesses, whose testimony we have referred to above, that appellee was affected with dizziness, loss of memory, and that he had nervous tantrums and could not concentrate his mind. Just prior to receiving his discharge from military service on April 25, 1919, appellee signed a written statement that he was then suffering from no disability or disease of any character. It was stipulated that the policy in suit lapsed for non-payment of the premium due May 1, 1919, and the period of grace expired at midnight, May 31, 1919.

We are convinced that the evidence viewed in its most favorable aspect to appellee conclusively shows that he was not totally and permanently disabled at the time of his discharge nor prior to the lapse of his insurance. It is true that most of appellee's medical witnesses gave in evidence their conclusions as to his total, permanent disability. We have purposely not heretofore referred to those conclusions, nor have we considered them except as they bear upon the permanency of the disabilities referred to by the doctors. To do otherwise we think could not be justified under the ruling in United States v. Spaulding, 293 U.S. 498, 55 S.Ct. 273, 79 L.Ed. 617. We are not inclined to unduly criticise the evidence given on behalf of appellee at the trial, for it is most difficult to avoid the influence of sympathy which may unconsciously arise by reason of the subsequent development of facts. It must be remembered, however, that we are not dealing entirely with conditions as they existed at the time of trial, but with conditions as they existed on and subsequent to May 31, 1919, when the policy lapsed. Unless he was totally and permanently disabled within thirty days after the lapse of his policy, he can not recover under this contract. We are not permitted to base our ruling on what we think the government ought to do under such circumstances, aside from the contract. The question here is, has it done what it promised to do under the contract? We must bear in mind that existing legislation provides for the care of soldiers who in any degree have become incapacitated by reason of their military service. Whether those provisions are sufficient is not an issue which we can consider here. A perusal of all the evidence convinces us that there was no substantial evidence to support the finding that appellee was totally and permanently disabled within the meaning of the statute (38 U.S.C.A. § 473), and Treasury Decision No. 20, promulgated on March 9, 1918.

The judgment of the District Court is reversed and the cause remanded with instructions to grant a new trial.