## MATTER OF CANAS

### In Deportation Proceedings

A-26790253

A-26790255

*Decided by Board September 13, 1988*

(1) Although it provides "significant guidance," the Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* (Geneva, 1979) does not have the force of law with respect to the interpretation of the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

(2) Neither the terms of the Protocol nor the conduct of nations which are signatories to the Protocol is dispositive of the issue of whether conscientious objectors who come from countries with compulsory military service should be regarded as "refugees" under the Protocol.

(3) The *Handbook* suggests that nations may wish to extend protection to alien conscientious objectors consistent with developments in domestic laws, but this is a policy matter separate from the traditional issue of whether an alien is a "refugee" under the Protocol; such policy questions are outside the jurisdiction of the Board of Immigration Appeals.

(4) The motivation of an alleged persecutor is a relevant and proper consideration when analyzing an alien's eligibility for asylum under the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102.

(5) An alien must demonstrate that there is an objective basis for his fear in order to establish that he has a "well-founded fear of persecution" within the meaning of the Refugee Act.

(6) Absent a showing that his government enacted its conscription laws with the intent of persecuting members of a certain religion, or that the laws are carried out in a persecutory manner against persons with particular religious beliefs, an alien with religious objections to military service does not establish eligibility for asylum although he may be prosecuted for a refusal to perform military service.

Interim Decision #3074

CHARGE:
    Order: Act of 1952—Sec. 241(a)(2) [8 U.S.C. § 1251(a)(2)]—Entered without inspec-
            tion (both respondents)

ON BEHALF OF RESPONDENTS:           ON BEHALF OF SERVICE:
    Karen Musalo, Esquire               David Dixon
    231 Franklin Street, Suite 2        Appellate Counsel
    San Francisco, California 94102

BY:  Milhollan, Chairman; Dunne, Morris, Vacca, and Heilman, Board Members

This is an appeal from a decision dated February 4, 1986, in which the immigration judge denied the respondents' requests for relief pursuant to sections 208(a) and 243(h) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158(a) and 1253(h) (1982), but granted the respondents the privilege of voluntary departure in lieu of deportation. The respondents' appeal will be dismissed.

The respondents, natives and citizens of El Salvador, are brothers. Respondent Jose Canas-Segovia ("Jose Canas") is 18 years old. Respondent Oscar Canas-Segovia ("Oscar Canas") is 20 years old. The respondents entered the United States without inspection on January 27, 1985. On the following day, the Immigration and Naturalization Service issued an Order to Show Cause, Notice of Hearing, and Warrant for Arrest of Alien (Form I-221S) against each respondent, charging that they were both deportable pursuant to section 241(a)(2) of the Act, 8 U.S.C. § 1251(a)(2) (1982), because they had entered this country without inspection.

At their deportation hearings on April 11, 1985, the respondents conceded that they were deportable as charged in the Orders to Show Cause. We therefore find that the respondents' deportability has been established by clear, unequivocal, and convincing evidence as required by *Woodby* v. *INS*, 385 U.S. 276 (1966), and 8 C.F.R. § 242.14(a) (1988). On December 16, 1985, the respondents' motion to have their deportation hearings consolidated was granted by the immigration judge.

The respondents submitted written applications for asylum.[1] In their applications, the respondents stated primarily that they belong to the Jehovah's Witnesses religion, which forbids its members from performing military service, and that they fled El Salvador before the Government there could conscript them for military service. Pursuant to regulation, the respondents' applications were referred to the Department of State, Bureau of Human Rights and

---

[1] Pursuant to 8 C.F.R. § 208.3(b) (1988), a request for asylum is also regarded as a request for withholding of deportation under the Act.

Humanitarian Affairs ("BHRHA") for advisory opinions. 8 C.F.R. § 208.10(b) (1985). The BHRHA issued brief advisory opinions concerning the respondents' applications in which it concluded that the respondents had "failed to establish a well-founded fear of persecution upon return to El Salvador within the meaning of the United Nations Convention and Protocol Relating to the Status of Refugees."

After a hearing on the merits of the respondents' applications, the immigration judge concluded that the respondents had not demonstrated eligibility for asylum and withholding of deportation. The immigration judge found that the respondents were credible witnesses and that their religious convictions were bona fide. He concluded, however, that because there was no evidence in the record that the Salvadoran Government persecutes Jehovah's Witnesses on account of their religion or for any other reason, the Government's policy of requiring military service of all its citizens, without allowing exceptions for conscientious objectors, did not constitute "persecution" within the meaning of the Act.

On appeal, the respondents argue that the immigration judge failed to apply the proper standards to their asylum and withholding of deportation applications. They argue further, relying on the Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* (Geneva, 1979) ("*Handbook*"), that conscientious objection to military service that is based on religious beliefs is a valid basis for obtaining refugee status under the Act. Alternatively, the respondents argue that because of their refusal to perform military service in El Salvador, the Government will now view them as "subversives" and subject them to "extra-judicial sanctions." For these reasons the respondents contend that the immigration judge's decision should be reversed and that their asylum and withholding of deportation applications should be granted.

In *INS* v. *Stevic,* 467 U.S. 407 (1984), the Supreme Court held that an alien establishes eligibility for withholding of deportation under section 243(h) of the Act if he can demonstrate a "clear probability of persecution" on account of his "race, religion, nationality, membership in a particular social group, or political opinion," if he were returned to a designated country. In *INS* v. *Cardoza-Fonseca,* 480 U.S. 421 (1987), which was decided subsequent to the immigration judge's decision in this case, the Court did not specify the standard governing asylum applications under section 208(a) of the Act but did conclude that there is a significant difference between

the asylum and withholding of deportation standards for relief and that an alien need not show a "clear probability of persecution" in order to be eligible for asylum.[2]

In *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987), after reviewing decisions of the United States courts of appeals involving the asylum standard, this Board adopted the "reasonable person" test for the adjudication of asylum cases. We stated that an alien demonstrates eligibility for asylum "if he shows that a reasonable person in his circumstances would fear persecution" on account of one of the five grounds enumerated in section 101(a)(42)(A) of the Act. [3] *Id.* at 445.

The respondents here gave the following testimony in support of their asylum and withholding of deportation applications. Respondent Jose Canas testified that he began attending Jehovah's Witnesses services at a "Kingdom Hall" in El Salvador when he was 8 years old. He added that he began to study the religion earnestly at age 13. Although he had not been baptized as a Jehovah's Witness at the time of his deportation hearing, Jose Canas explained that one must study the Bible in great detail in preparation for baptism into the Jehovah's Witnesses faith. Jose Canas testified that he had been attending a Kingdom Hall in San Francisco since he had been in this country and that he did intend to become baptized as a Jehovah's Witness.

Respondent Jose Canas gave detailed testimony concerning the tenets of the Jehovah's Witnesses religion. He emphasized in his testimony that his religion forbade him from serving in the military under any circumstances. He also stated that his grandmoth-

---

[2] The Refugee Act of 1980 revised section 243(h) of the Act and added section 208(a) to the Act. *See* sections 203(e) and 201(b) of the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, 103. The Refugee Act also added a definition of "refugee" to the Act. *See* section 201(a) of the Refugee Act, Pub. L. No. 96-212, 94 Stat. 102. A "refugee" is now defined in section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1982), as

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

[3] The respondents argue initially in their brief that the immigration judge did not apply the proper standards to their asylum and withholding of deportation applications. As noted above, the immigration judge entered his decision in this case prior to the Supreme Court's decision in *INS* v. *Cardoza-Fonseca, supra*. Therefore, on appeal, we will apply the "clear probability" standard to the respondents' withholding of deportation applications and the less demanding "well-founded fear" standard to their asylum applications.

700

er, his cousin, several of his aunts, and, overall, "the majority" of his family members were Jehovah's Witnesses.

Respondent Jose Canas testified further that on one occasion when he was in El Salvador, he saw the military forcibly conscript a group of underaged males who lived in his neighborhood. He stated that after he witnessed this incident, he was afraid to go out of his house for fear that he too would be conscripted against his will. The respondent also stated that he refrained from going out with his friends, or from going to places where a group of young men could be found, because of his fear of forcible conscription.

Respondent Jose Canas testified that he became even more afraid of being conscripted by the military after he learned that the Government was planning to implement a new conscription policy. According to the respondent, the Government planned to send draft notices to all 18-year-old males in El Salvador, and if the draftee did not respond after having received three notices, then the Government planned to go to the home of the draftee and force him to join the military. The respondent stated that he left El Salvador 1 year after he learned of the new conscription policy. He was 15 years old when he left El Salvador.

The respondent testified that the reason he left El Salvador was that he was afraid that he would be forced to join either the Salvadoran Army or the Salvadoran guerrillas, and he could not fight with either side because of his religious beliefs. The respondent stated that neither the guerrillas nor the army approached him and asked him to join them, and he did not receive a draft notice prior to his departure from El Salvador. The respondent also stated that he did not know whether the guerrillas or the army were aware that he was studying the Jehovah's Witnesses faith, but he did testify that neither group had come to the Kingdom Hall when the respondent was worshiping there. Finally, respondent Jose Canas testified that members of a guerrilla group known as the "Popular Revolutionary Block" ("BPR") came to his school and asked some of the students to distribute leaflets and pamphlets. He stated that the group members were not interested in him because he was too young. He stated further that they did not ask him to do anything on their behalf.

Respondent Oscar Canas' testimony was similar to that of his brother Jose. Oscar Canas testified that he too had attended a "Kingdom Hall" in El Salvador since he was 8 years old. He testified that he had not been baptized as a Jehovah's Witness, but that he was studying the religion in order to become baptized. Respondent Oscar Canas testified that 15 of his relatives were either offi-

cially recognized as Jehovah's Witnesses or were studying to become Jehovah's Witnesses.

Respondent Oscar Canas also testified in detail about the tenets of the Jehovah's Witnesses religion. He stated that he could not serve in the military because of his religious beliefs and that he would not render any service that was related to the furtherance of a war effort. He also stated that he could not fight along with the Salvadoran guerrillas because of his religious principles.

Oscar Canas stated that his family lived in an area in El Salvador where there were often battles between the guerrillas and the Salvadoran Army. The respondent stated that in 1981 and 1982, there were several battles in which the respondent heard gunfire so close to his house that he threw himself on the floor inside the house. The respondent also stated that he remained in his house while these battles occurred and that none of the combatants approached him during the battles.

Respondent Oscar Canas testified that he had also witnessed an incident in which members of the Salvadoran Army forcibly conscripted underaged males. The respondent stated that he and his friends were playing basketball when some soldiers arrived in a yellow pickup truck. The respondent stated further that he and his friends immediately left the area, but that as they looked back they saw soldiers taking away some of the young men that had remained behind. The respondent also testified that the legal age for conscription in El Salvador was 18, but that the army would take youths who appeared capable of serving in the military regardless of their age.

Like his brother Jose, Oscar Canas testified that he stayed indoors after he had seen the soldiers forcibly conscripting other young males. When he learned of the Government's new conscription policy, the respondent testified that he feared he would no longer be able to avoid conscription by simply remaining at home. He testified that he too left El Salvador because he was afraid that he would be forced to join either the army or the guerrillas. When asked by counsel as to how he believed officials of the Salvadoran Army would respond if he told them that he could not serve in the military because of his religious beliefs, the respondent stated: "I don't think they would care about what my religious beliefs were. What they care about is [whether] they can pick up people for fighting." Oscar Canas stated further that he left El Salvador with his brother before the Government's new conscription policy went into effect, that he was 16 years old when he left El Salvador, and that the army did not order him to report for military service before he left there.

Respondent Oscar Canas also testified that in 1980 or 1981, members of a guerrilla group known as the "BPR" came to his school and asked all the students to join their cause and "to go out and distribute leaflets." The respondent stated that the guerrillas did not threaten the students directly, but told the students that "something bad" would happen to those who did not cooperate. The respondent also stated that he stopped attending the school for "half a year" because he was afraid of what the guerrillas might do to him if he refused to aid them. The respondent later testified that the guerrillas had asked all the students at his school to distribute leaflets, but that the guerrillas did not return with materials for the students to distribute; and he did not have any further contact with the guerrillas after he left the school. The respondent also testified that he did not tell the guerrillas, nor did it become known to them, that he was studying the Jehovah's Witnesses religion.

The respondents have submitted documents and affidavits into the record in support of their asylum applications. Among the documents included in the record is a United Nations ("U.N.") report on conscientious objection to military service. This report indicates that according to Salvadoran law, all males between the ages of 18 and 30 are required to perform military service—exceptions are permitted only for health and family reasons. The report also indicates that the Salvadoran Government does not allow for exemptions from military service for conscientious objectors. Furthermore, the report provides that conscientious objectors in El Salvador may be imprisoned and punished as deserters. The evidence in the record also indicates that Jehovah's Witnesses are categorically opposed to participation in war and service in the military.

The Service has not filed a brief on appeal in this case. At oral argument, however, the Service stated that its present position is that an alien who belongs to a "sect" such as the Jehovah's Witnesses, which historically has opposed all wars, and who comes from a country which does not allow exemptions from military service for conscientious objectors should be eligible for asylum in the United States.[4] The Service requested, however, that the record be remanded in this case so that the immigration judge could further inquire into the genuineness of the respondents' religious convictions. Based upon our review of the record, we find that the respondents came forward with sufficient testimony to demonstrate that their religious convictions are genuine. Accordingly, we will proceed to a consideration of the respondents' argu-

---

[4] The Service did not offer any authority at oral argument in support of this position.

ments on appeal with the assumption that the respondents possess the religious beliefs of bona fide Jehovah's Witnesses.

The respondents' chief contention on appeal is that, pursuant to the guidelines set forth in the United Nations High Commissioner for Refugees ("UNHCR") *Handbook*, they have demonstrated eligibility for asylum under the 1980 Refugee Act. Congress enacted the Refugee Act in part to make the domestic refugee laws conform to the 1967 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268 ("Protocol"), to which the United States had acceded in 1968. See *INS* v. *Cardoza-Fonseca, supra,* at 436-37; *INS* v. *Stevic, supra,* at 426-27. The Supreme Court stated in *INS* v. *Cardoza-Fonseca, supra,* at 439 n.22, that the *Handbook* provides "significant guidance" with respect to interpretation of the Protocol. The Court also stated, in the context of its decision concerning the evidentiary standard in asylum cases:

> We do not suggest . . . that the explanation in the U.N. Handbook has the force of law or in any way binds the INS with reference to the asylum provisions of § 208(a). Indeed, the Handbook itself disclaims such force, explaining that "the determination of refugee status under the 1951 Convention and the 1967 Protocol . . . is incumbent upon the Contracting State in whose territory the refugee finds himself."

*Id.; see also Matter of Acosta,* 19 I&N Dec. 211, at 220 (BIA 1985) (modified on other grounds in *Matter of Mogharrabi, supra,* at 446-47).

In the brief in support of their appeal, the respondents have cited paragraphs 170 and 172 of the *Handbook* to support their argument that they qualify for asylum. These paragraphs provide as follows:

> 170. There are . . . cases where the necessity to perform military service may be the sole ground for a claim of refugee status, i.e., when a person can show that the performance of military service would have required his participation in military action contrary to his genuine political, religious or moral convictions, or to valid reasons of conscience.

> 172. Refusal to perform military service may . . . be based on religious convictions. If an applicant is able to show that his religious convictions are genuine, and that such convictions are not taken into account by the authorities of his country in requiring him to perform military service, he may be able to establish a claim to refugee status. Such a claim would, of course, be supported by any additional indications that the applicant or his family may have encountered difficulties due to their religious convictions.

*Handbook, supra,* at 40.

In addition, the respondents submitted into evidence a letter, dated January 30, 1986, from Joachim Henkel, a UNHCR Deputy Representative, addressed to the respondents' counsel. In the letter, Mr. Henkel writes:

Paragraph 170 of the Handbook addresses the situation of a person whose sole basis for a claim to refugee status is that the performance of military service would have required his participation in military action "contrary to his genuine political, religious or moral convictions, or to valid reasons of conscience." State practice on this issue is not uniform. UNHCR takes the view, however, that, especially where no alternative to military service exists, significant punishment for refusal to perform military service, based on strong religious or moral convictions, or on political opinion, may be considered persecution. Therefore, assuming that the religious, moral or political conviction advanced is reasonably credible, and surrounding circumstances of the case do not argue otherwise, a draft evader or deserter of that description may be accorded refugee status even though the punishment he faces does not differ substantially from that meted out generally for this offense because of a simple disinclination to serve.

Thus, the respondents argue that the performance of military service in El Salvador would be contrary to their religious convictions, and that any punishment which they would receive while adhering to their convictions would amount to religious persecution.

We begin our analysis by emphasizing that there is no provision in the Protocol which declares that conscientious objectors from nations with compulsory military service are per se refugees, nor is there any indication of a consensus among the signatories to the Protocol that persons similarly situated to the respondents qualify as refugees under the terms of the Protocol. To the contrary, the above-cited letter written by a UNHCR Deputy Representative indicates that "State practice on this issue is not uniform." [5] The re-

---

[5] The U.N. report on conscientious objection that the respondents submitted into evidence reflects that on December 4, 1981, the U.N. Secretary-General addressed a request for comments concerning conscientious objection to military service to various governmental and nongovernmental organizations. The majority of the 11 governments that responded to this request for information took the position that while persons who objected to military service for reasons of conscience could apply for asylum, their applications would be considered on a case-by-case basis. The UNHCR, which also responded to the Secretary-General's request, stated the following in its reply, dated February 15, 1982:

Conscientious objectors may ... be considered as refugees and be granted asylum if they fulfill the normal criteria of refugee status, i.e., if they have a well-founded fear of persecution for reasons of race, religion, nationality, membership in a particular social group or political opinion. In applying these criteria to conscientious objectors, it should be borne in mind that fear of prosecution or punishment for objection to military service, desertion or draft evasion, is not a reason for granting refugee status unless there are also elements indicating a well-founded fear of persecution under the refugee definition. Whether such elements exist must of course be determined according to the circumstances of the particular case.

Thus, although the record reflects in this case that the UNHCR apparently no longer subscribes to this view, the UNHCR previously indicated, in its written response to the Secretary-General's inquiry, that a conscientious objector would not qualify as a refugee if he demonstrated only that he feared prosecution for his objection to military service.

spondents have relied on the *Handbook* as the basis for their asylum requests, but the *Handbook* paragraphs cited by the respondents do not have the "force of law" and, in our view, are not dispositive of the issue in this case. *Handbook* paragraphs 170 and 172 do suggest that a refusal to perform military service which is grounded in religious belief may be a basis for obtaining refugee status. Paragraph 172 adds that "[s]uch a claim would ... be supported by any additional indications that the applicant or his family may have encountered difficulties due to their religious convictions." The respondents did not make any showing that their family members had "encountered difficulties" in El Salvador because of their religious beliefs. Thus, the core of the respondents' argument is that they are "refugees" under the Protocol because they are conscientious objectors who come from a nation with compulsory military service.[6] We decline to construe the refugee definition contained in the Protocol in such a broad manner, although the UNHCR has advised that its position is that persons such as the respondents "may be accorded refugee status" under the Protocol.

The *Handbook* itself suggests that the issue of extending protection to conscientious objectors is a matter of state prerogative rather than legal right under the Protocol. Paragraph 173 of the *Handbook*, which the respondents have not cited in their brief, provides:

> The question as to whether objection to performing military service for reasons of conscience can give rise to a valid claim to refugee status should also be considered in the light of more recent developments in this field. An increasing number of States have introduced legislation or administrative regulations whereby persons who can invoke genuine reasons of conscience are exempted from military service, either entirely or subject to their performing alternative (i.e. civilian) service. The introduction of such legislation or administrative regulations has also been the subject of recommendations by international agencies. In the light of these developments, *it would be open to Contracting States,* to grant refugee status to persons who object to performing military service for genuine reasons of conscience.

*Handbook, supra,* at 40–41 (emphasis added). This passage provides that nations may wish to extend protection to aliens consistent with developments in domestic laws, and it also suggests that the decision concerning whether to offer such protection would be a policy matter separate from the traditional issue of whether an alien is a victim of "persecution" under the Protocol. The question of whether these respondents should be offered protection as a

---

[6] According to the U.N. report in the record, which was prepared in 1983, 40 countries had conscription without providing any alternative to military service.

matter of policy, and for reasons separate from the interpretation of the Protocol and the Refugee Act, will be discussed below. Neither the explicit terms of the Protocol nor the practice of signatories to the Protocol, however, resolves the issue of whether the respondents here are "refugees." The *Handbook* is not controlling authority with respect to this issue and, in this instance, the guidance set forth in the *Handbook* is not free from ambiguity. We will therefore turn to a consideration of whether the respondents are "refugees" under this nation's asylum laws.

The issue before this Board, then, is whether aliens who refuse to perform military service in their native country for genuine religious reasons, and who would be subject to prosecution for that refusal, qualify as "refugees" within the meaning of the Refugee Act.[7] The respondents urge that they do qualify as "refugees," although they have not shown, and apparently do not claim, that the Salvadoran Government has the inclination to persecute Jehovah's Witnesses for any reason unrelated to the respondents' argument concerning conscription. The respondents also do not claim that the Salvadoran Government has enacted its conscription laws with a persecutory intent, or that the conscription laws are applied in a persecutory manner based on an individual's "race, religion, nationality, membership in a particular social group, or political opinion."[8]

As the United States Court of Appeals for the Ninth Circuit has stated, the motivation of an alleged persecutor is a relevant and proper consideration when analyzing an alien's eligibility for asylum. *See Lazo-Majano v. INS*, 813 F.2d 1432, 1435 (9th Cir. 1987); *Zayas-Marini v. INS*, 785 F.2d 801, 806 (9th Cir. 1986); *Hernandez-Ortiz v. INS*, 777 F.2d 509, 516 (9th Cir. 1985); *see also Matter of Maldonado*, 19 I&N Dec. 509, at 513 (BIA 1988). An examination of the motivation of the alleged persecutor in this case,

---

[7] The respondents presented evidence and gave testimony concerning the Salvadoran Army's forcible conscription of youths who had not yet reached the age of 18. The respondents are now over 18 years old and would be subject to lawful conscription in El Salvador. The respondents testified that the Government's intention to mail draft notices to 18-year-old males, which in itself is certainly a lawful process, was what prompted them to leave El Salvador. The issue of whether the Salvadoran Government's forcible and extralegal conscription of underaged males constitutes "persecution" is not presented by this appeal. We note, though, that the evidence in this case indicates that both the Salvadoran Army and the guerrillas have engaged in the indiscriminate, forcible recruitment of young males in El Salvador. Because of its indiscriminate nature, this forcible recruitment would appear to be a risk inherent in a civil war, rather than a risk of "persecution." *See Campos-Guardado v. INS*, 809 F.2d 285, 290 (5th Cir. 1987).

[8] *See infra* note 12.

the Salvadoran Government, reveals that the Government has not "singled out" the respondents for persecution because of their religious beliefs. The Salvadoran Government has been involved in an ongoing struggle in which it has sought to overcome the armed resistance in El Salvador. As a means to this end, the Salvadoran Government has required that all males between the ages of 18 and 30 perform military service. The Government has not allowed for exemptions from military service for conscientious objectors. This is most likely because the Government has determined that it needs as many able-bodied men as possible to pursue its military objectives. But there is nothing in this record which indicates that the Salvadoran conscription law does not offer exceptions from mandatory service to conscientious objectors because the intent of the law is to persecute Jehovah's Witnesses, or members of any other religious group which is opposed to military service and war.[9] Nor is there evidence that the conscription laws were enacted or are applied in a persecutory manner, e.g., with only those with religious objections being punished for their refusal to join the military. See Handbook, supra, para. 59.

The respondents argue that from their perspective, the Salvadoran Government's actions are tantamount to religious persecution, because they would be punished for a refusal to perform military service that was based on religious convictions.[10] This argument ignores the well-settled requirement in cases involving interpretation of the Refugee Act that there must be an objective basis to an alien's fear before that fear will be considered "well founded." See, e.g., Diaz-Escobar v. INS. 782 F.2d 1488, 1492 (9th Cir. 1986); Cardoza-Fonseca v. INS, 767 F.2d 1448, 1453 (9th Cir. 1985), aff'd, 480 U.S. 421 (1987); Carvajal-Munoz v. INS, 743 F.2d 562, 574 (7th Cir. 1984); Matter of Mogharrabi, supra, at 444. That is, a reasonable person in the position of the respondents might fear prosecution for

---

[9] Although the Service stated its view at oral argument that an alien would be eligible for asylum if he could show that he belonged to a "sect" such as the Jehovah's Witnesses which opposes all wars, and that he comes from a country which requires military service from all its male citizens, we do not agree that such an alien qualifies as a "refugee," as defined in section 101(a)(42)(A) of the Act, absent some indication that his government is inclined to persecute members of his religious group.

[10] In support of this position, the respondents have cited a 1962 decision of the West German Federal Administrative Court, in which that court stated:

[A] conscientious objector on grounds of religion is involved in a conflict between two duties. On one hand, the State requires him to perform military service; on the other hand his religion requires him to refrain from such service for reasons of conscience. If the State takes action against the person involved in such a conflict, the effect as far as he is concerned is persecution because of his religion.

a refusal to perform military service but would not believe that he had been punished on account of his religious beliefs where the same penalties are applied to all violators, regardless of the reasons for the refusal to serve. Respondent Oscar Canas himself testified that he did not think the Salvadoran military would care about his religious beliefs and stated that what they did care about was "pick[ing] up people for fighting." Although the respondents may view any penalty that they receive for their refusal to serve as punishment for their religious beliefs, we do not consider that punishment to constitute persecution within the meaning of the Refugee Act and cases interpreting that Act,[11] in the absence of a showing that the Government's motivation for imposing the punishment stems from the respondents' religious beliefs, or that the Government's conscription laws are carried out in a manner which punishes a person because of his particular religious beliefs or his religious affiliation.[12]

Since the respondents have not shown that the Salvadoran Government is inclined to persecute Jehovah's Witnesses or that the Government is aware of the respondents' religious beliefs, the Government would presumably punish the respondents just as it would punish any other Salvadoran who refused to comply with the conscription process. The Salvadoran Government may penalize the respondents for their decision concerning military service, but it is apparent that any punishment imposed would relate to the respondents' ultimate choice not to serve in the military, rather than the reasons or beliefs underlying the respondents' choice. In this

---

[11] In their brief, the respondents cite *Sarkis v. Sava*, 599 F. Supp. 724 (E.D.N.Y. 1984), in support of their contention that an alien can demonstrate eligibility for asylum by showing that military service would be contrary to his "political, religious, or moral convictions." The court's use of this language in that case was mere dictum, however, as the court ultimately concluded that the petitioners had not even alleged an objection to military service that was based on reasons of conscience. *Id.* at 726-27; *see also Sarkis v. Nelson*, 585 F. Supp. 235 (E.D.N.Y. 1984). The respondents also rely on *Matter of Salim*, 18 I&N Dec. 311 (BIA 1982), for the proposition that aliens who object to military service may be eligible for asylum. In *Matter of A-G-*, 19 I&N Dec. 502 (BIA 1987), we clarified the holding in *Matter of Salim, supra*, by pointing out that the Afghan national in *Salim* did not object to performing military service for his own government, but instead for an army that was under a foreign government's control. *See also Handbook* paras. 165.

[12] Asylum applicants need not prove a government's "subjective" intent to persecute, although there may be evidence of such intent in some cases. Reasonable inferences can be drawn from governmental or individual actions. If, for example, a law provided exceptions for all but those with particular religious beliefs, or was neutral on its face but enforced only against those with particular religious convictions, such cases would be presented in a very different light from this one. *See Handbook, supra*, para. 56-60.

regard, the respondents have not demonstrated that the Salvadoran Government would regard the fact that the respondents have religious reasons for their refusal to serve in the military as anything but a matter of coincidence.

To conclude that the application of the Salvadoran Government's conscription law to Jehovah's Witnesses inherently amounts to "persecution" would require that we condemn the Salvadoran Government for not allowing the same exemptions from military service which this nation has allowed.[13] Although the Salvadoran Government's conscription process may not be as advanced or enlightened as the process in this country or other countries has been, the respondents have not shown that the Salvadoran Government's motivation in establishing or carrying out this process is the persecution of Jehovah's Witnesses, or persons generally with religious objections to military service. Thus, we conclude that the respondents have not demonstrated eligibility for asylum by virtue of their conscientious objection to military service argument.

The respondents also advance the argument on appeal that if they were returned to El Salvador and refused to perform military service, the Government would regard them as "subversives" or "guerrilla sympathizers" and subject them to "extra-judicial sanctions." The respondents therefore argue that they are eligible for asylum because the Government would "impute" the political opinions of "subversives" or "guerrilla sympathizers" to the respondents and then persecute the respondents for those opinions.

The respondents do not base their "imputed political opinion" argument on their particular circumstances but contend that any male who refuses to perform military service in El Salvador is subject to extra-judicial sanctions including torture and death.[14] We

---

[13] We note too that a finding that these respondents are victims of religious persecution would require a concomitant finding that the persons who enacted or who carry out the Salvadoran conscription laws have "ordered, . . . assisted, or otherwise participated in the persecution" of others "on account of . . . religion," thereby rendering all such persons ineligible for asylum pursuant to section 101(a)(42)(B) of the Act. *See Matter of Fuentes,* 19 I&N Dec. 638, at 661–62 (BIA 1988).

[14] The respondents have submitted affidavits in support of this argument. Several of the affiants state that those who refuse to join the military in El Salvador are tortured or killed. Others state that those who resist induction into the military are regarded as guerrillas or guerrilla sympathizers by the army. A former lieutenant colonel in the Salvadoran Army states:

If a man were ordered to report for the draft and did not show up, he would be subject to court martial. Refusal to join the Army would result in a jail term. If the person becomes vocal in his opposition, he would become a real target for government persecution.

*Continued*

rejected a similar argument in *Matter of A–G–, supra*. In that case, we found that a Salvadoran who claimed that he would be tortured or killed by "death squads" if returned to El Salvador had not established that "mere failure to serve in the military is the kind of activity which draws the attention of the persons who carry out these killings." *Id.* at 507.

With regard to the respondents in this case, it is not reasonable to suggest that the Salvadoran Government, or forces beyond that Government's control, would view the respondents as subversives or guerrillas, and that the respondents would then incur the risk of punishment or harm to which subversives and guerrillas in El Salvador are exposed. The respondents here are pacifists. The Government may well inquire as to the reasons for the respondents' refusal to serve in the military, but would then discover that the respondents' objection to conscription was based on their religious beliefs. The Government might then proceed to punish the respondents, in accordance with its conscription law, but there is no sound reason to believe that the Government would view these respondents as possible military opponents. We therefore find no merit to the respondents' "imputed political opinion" argument.[15]

Because we conclude that the respondents have not shown that reasonable persons in their positions would fear persecution in El Salvador, we conclude that the respondents are not "refugees" within the meaning of the Refugee Act and that they are not eligible for asylum under the Act. Because the respondents also have not demonstrated a "clear probability" of "persecution" on account of their religious beliefs, or any of the other grounds enumerated in section 243(h) of the Act, we conclude that the respondents are not eligible for withholding of deportation.

A remaining consideration in this case is whether the Government may wish to extend protection to the respondents, and to persons similarly situated, as a matter of national policy. See *Handbook, supra,* para. 173. The Service has not taken a formal position on appeal in this case, and the rationale for the Service's oral position has not been made clear. As noted above, we do not agree

---

According to a Library of Congress report concerning military service in El Salvador, which is attached to the respondents' brief in support of their appeal, persons who fail to report for military duty in time of war are subject to 1 to 3 years' imprisonment.

[15] The respondents have also not shown that they can reasonably fear persecution from the guerrillas in El Salvador. Although Oscar Canas testified that the guerrillas came to his school and asked him and all his classmates to help the guerrillas by distributing leaflets, the respondent did not show that he was harmed or threatened by the guerrillas because of a political view or religious belief which he possessed.

with, and are not bound by, the Service's contention at oral argument that aliens similarly situated to the respondents who demonstrate that their religious beliefs are bona fide are "refugees" within the meaning of the Refugee Act. If, however, the Service is suggesting that as a matter of policy certain aliens who refuse to perform military service for religious reasons should not be returned to countries with compulsory military service, then such a policy should be implemented by regulation so that its contours can be defined and the policy can be openly announced and uniformly applied. *See* section 103(a) of the Act, 8 U.S.C. § 1103(a) (1982); 8 C.F.R. § 2.1 (1988); 28 C.F.R. § 0.105(b) (1988). Implementation of such policy matters, however, is outside this Board's jurisdiction.

The Board's jurisdiction in this case is limited to a review of the immigration judge's decision and the determination as to whether these respondents qualify as "refugees" under the Refugee Act. *See* 8 C.F.R. § 3.1(b)(2) (1988). For the reasons set forth above, we have concluded that the respondents do not so qualify. Accordingly, because there is no relief available to the respondents under the Refugee Act, their appeal will be dismissed. The following orders will be entered.

**ORDER:** The appeal is dismissed.

**FURTHER ORDER:** Pursuant to the immigration judge's order and in accordance with our decision in *Matter of Chouliaris,* 16 I&N Dec. 168 (BIA 1977), the respondents are permitted to depart from the United States voluntarily within 30 days from the date of this order or any extension beyond that time as may be granted by the district director; and in the event of failure so to depart, the respondents shall be deported as provided in the immigration judge's order.