## MATTER OF VILLALTA

### In Deportation Proceedings

### A-27652767

### *Decided by Board February 14, 1990*

(1) Alien who established through his direct and uncontradicted testimony that he and his immediate family members were singled out and threatened with death by a "Death Squad," and whose brother was subsequently slain in a noncombat situation, demonstrated a well-founded fear of persecution in El Salvador pursuant to section 208(a) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a) (1982).

(2) Alien's testimony that he and his immediate family members had been threatened with harm due to his activities in a student organization in El Salvador established a well-founded fear of persecution on account of political opinion.

CHARGE:

Order: Act of 1952—Sec. 241(a)(2) [8 U.S.C. § 1251(a)(2)]—Entered without inspection

ON BEHALF OF RESPONDENT:                   ON BEHALF OF SERVICE:
Steven A. Abel, Esquire                    David Dixon
P.O. Box 219                               Appellate Counsel
2 Congers Road
New City, New York 10956

BY: Milhollan, Chairman; Dunne, Morris, Vacca, and Heilman, Board Members

This is an appeal from a decision, dated April 22, 1987, in which the immigration judge found the respondent deportable on his own admissions, denied his requests for relief pursuant to sections 208(a) and 243(h) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158(a) and 1253(h) (1982), and ordered him deported to El Salvador. The respondent's appeal will be sustained.[1]

The respondent is a 25-year-old native and citizen of El Salvador. He entered the United States without inspection on November 15, 1985. On the same day, the Immigration and Naturalization Service issued an Order to Show Cause, Notice of Hearing, and Warrant for

---

[1] Considering our disposition of the respondent's appeal, we need not address his contention raised at oral argument that the immigration judge erred by denying his application for voluntary departure as a matter of discretion.

Arrest of Alien (Form I-221S) against the respondent, charging him with deportability pursuant to section 241(a)(2) of the Act, 8 U.S.C. § 1251(a)(2) (1982), due to his unlawful entry. In a written motion, the respondent conceded that he was deportable as charged, and he requested that the venue in his case be transferred from Harlingen, Texas, to New York City. An immigration judge granted the respondent's venue request on March 11, 1986.

The respondent subsequently completed a Request for Asylum in the United States (Form I-589) to which he attached a detailed statement concerning his fear of persecution in El Salvador. He stated in his application that his family had been targeted for persecution by the Salvadoran Army and by paramilitary "Death Squads" operating in El Salvador because of his activities, and those of his family members, in the late 1970's and early 1980's. The respondent explained that after a "Death Squad" had painted three cryptic messages on the door of his family's home between October and December 1979, and after his brother was murdered in 1980, his family members dispersed throughout El Salvador. Maintaining that he had no other means of protecting himself, the respondent indicated that he eventually joined a guerrilla group in the canton of San Vicente. The respondent also submitted an Amnesty International report regarding human rights conditions in El Salvador, as well as newspaper articles concerning the Salvadoran Government and military, in support of his asylum request.

The respondent's written application for asylum was referred to the Department of State Bureau of Human Rights and Humanitarian Affairs ("BHRHA") for an advisory opinion. See 8 C.F.R. § 208.10(b) (1989). The BHRHA concluded that the respondent had "failed to establish a well-founded fear of persecution in El Salvador."

The respondent appeared for the hearing on the merits of his asylum request on January 23, 1987. The hearing was continued once due to the duration of the respondent's testimony, and a second time to give the respondent an opportunity to obtain corroborative evidence from El Salvador. At the conclusion of the final hearing, the immigration judge entered his oral decision denying the respondent's requests for asylum and withholding of deportation. This appeal followed.

Section 208(a) of the Act provides the Attorney General with the discretion to grant asylum to any alien who qualifies as a "refugee" within the meaning of section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1982). In pertinent part, that section defines a "refugee" as a person who is unable or unwilling to return to his native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular

143

social group, or political opinion." In *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987), we held that an alien demonstrates eligibility for asylum by proving that "a reasonable person in his circumstances would fear persecution." *See also INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987); *Carcamo-Flores v. INS*, 805 F.2d 60 (2d Cir. 1986). According to the terms of section 243(h)(1) of the Act, the Attorney General must withhold the deportation of an alien who demonstrates a "clear probability of persecution" in a designated country on account of his "race, religion, nationality, membership in a particular social group, or political opinion." *INS v. Stevic*, 467 U.S. 407 (1984).

The respondent presented the following testimony in his written asylum request and in the hearing on the merits of his asylum application. He stated that he was born and raised in San Vicente, El Salvador. He lived there with his parents, two sisters, and five brothers. The respondent stated that he attended school for 7 years in El Salvador, until he reached the age of 15. He stated further that in 1979, the final year of his education, he became involved in a secondary student organization known as MERS. The respondent joined MERS while he was attending the Instituto Servelio Nabarrete in San Vicente.

The respondent testified that he printed leaflets and participated in demonstrations as a member of MERS. He added that his sister, Sylvia, who was studying in San Salvador, also joined MERS in 1979. The respondent stated that he and Sylvia attended demonstrations together at which students protested about educational conditions in El Salvador. He also stated that some of these demonstrations were violently dispersed by soldiers of the Salvadoran Army.

The respondent testified further that his father raised corn and other vegetables on the land that he owned in San Vicente. In 1978, the respondent's father initiated a cooperative venture for raising crops with other farmers in the surrounding area. The respondent stated that his father and the farmers associated with him were viewed with suspicion by the local government officials because they had refused to participate in the Government's agrarian reform program and had started their own cooperative instead.

The respondent testified that his family began to receive threats from a "Death Squad" in late 1979. He testified that he believed his family received the death threats because of his and his sister's involvement in MERS. The respondent stated that the first such threat occurred in October 1979, when a white hand was painted on the door of his family's home, and the initials "E.M." (Escuadron de la Muerte) were marked beneath the hand. The respondent indicated that he and his family members understood the painted hand to mean that they had been singled out for death and destruction by paramilitary forces.

One month later, according to the respondent, a white hand was again painted on the door of his family's house, and ashes were left on the doorstep. The respondent stated that the ashes were another symbol that the "Death Squads" employed to warn the occupants of a house that they would be killed. In December 1979, the respondent's family received the final threat from the "Death Squad"; the respondent said that the last warning consisted of the white hand on the door, ashes on the doorstep, and an accompanying note which read: "Do you want to live longer?"

The respondent went on to testify that he moved to Cabanas, the canton neighboring San Vicente, to live with friends after his family had received this series of threats in 1979. He stated that the first attack against one of his family members occurred in October 1980, when his brother, Alejandro, was killed. The respondent stated that Alejandro was studying at the University of El Salvador in San Salvador. He stated further that Alejandro was abducted at the university by members of a "Death Squad," that he was subsequently tortured, and that his body was found in a garbage dump. The respondent testified that after he learned of Alejandro's death, he went to a church in San Salvador with his brother, Marcos, so that they could view Alejandro's body prior to burial. The respondent stated that he saw scars and wounds on Alejandro's body.

The respondent testified that a few weeks after Alejandro's death, his family members met to discuss what measures they could take to insure their safety. He stated that several of his brothers and sisters decided to move to various regions throughout El Salvador. His father remained on the farm in San Vicente, and his mother moved to the canton of Sonsonate. The respondent and his brothers, Marcos and Miguel, chose to join the guerrillas; his twin brother, Sabino, later joined the guerrillas in 1981. The respondent insisted that he had joined the guerrillas because "there was no other alternative."

In April 1981, while the respondent was staying at guerrilla camps in the mountainous areas within San Vicente, he learned of his mother's death. The respondent stated that his mother had been visiting relatives in Tecoluca during Holy Week, when "Death Squad" members came through that town. The respondent surmised that the "Death Squad" troops had not been specifically looking for his mother. He stated, however, that after they discovered her identity they would recognize her as an opponent since the "Death Squads" carried a list of suspects which, the respondent believed, included the names of all his family members. The respondent testified that two workers from Tecoluca informed him of his mother's death. The respondent and his brothers, Marcos and Miguel, went to Tecoluca to look for her body. He stated that they found her remains near the

house where she had been visiting. The house had been burned to the ground. The respondent's mother had been decapitated and dismembered. The respondent and his brothers then buried their mother.

The respondent testified further that after his mother's death, he was able to convince his father to leave his farmland in San Vicente and live in the mountains with the guerrillas. He stated that his father assisted the guerrillas by obtaining food for them.

The respondent's sister, Sylvia, was killed in November 1982. The respondent stated that she was working at a post office in San Miguel. She was arrested by soldiers of the Salvadoran Army, was detained for 8 days, and was later found dead. The respondent testified that he learned of Sylvia's death via a radio broadcast of a mass from San Salvador. He stated that he heard Archbishop Damas announce Sylvia's death during the mass. He stated too that he learned from the radio broadcast that Sylvia had been raped prior to her death. The respondent testified that Sylvia's death was also reported in El Mundo, a newspaper which, according to the respondent, is printed in San Salvador and is circulated throughout the country.

Finally, the respondent testified that his role in the guerrilla organization was to give combat training to recently recruited guerrilla soldiers. He stated that his brothers, Miguel and Sabino, died while fighting against government forces in a December 1984 battle near Chalatenango. The respondent stated that as a tribute to his twin brother, Sabino, he assumed Sabino's name after his death. The respondent's brother, Marcos, was captured by Salvadoran Army members while fighting along with the guerrillas, and the respondent said that he did not hear anything about Marcos thereafter. The respondent himself was wounded during a battle in the canton of Morazan in October 1983. He remained with the guerrillas for the next year and a half but stated that by May 1985, it became difficult for him to walk because of complications from his wound. The respondent was assisted to a privately managed clinic in San Salvador where he convalesced. He remained there for 20 days. After he left the clinic, the respondent stayed with his aunt until September 1985. He then decided to leave El Salvador. The respondent passed through Guatemala and Mexico en route to the United States, and he arrived here approximately 2 months after he had left El Salvador.

The Service has not filed an appellate brief in this case. At oral argument, however, the Service indicated that its position is that the respondent should be granted asylum. We reiterate that in significant cases where the Service does not oppose a grant of relief, a brief providing the rationale for the Service position should be submitted. *See Matter of Canas,* 19 I&N Dec. 697, at 711-12 (BIA 1988). If the Service has policy reasons for granting relief to certain aliens, then that

146

policy should be announced so that it can be applied openly in all appropriate cases. *Id.*

Upon reviewing the evidence which the respondent in the instant case has presented in support of his asylum request, we find that he has demonstrated a well-founded fear of persecution.[2] The rationale for our conclusion that the respondent qualifies as a "refugee" is as follows.

The respondent established through his testimony that he and his immediate family members were singled out and threatened with death by a "Death Squad." The respondent further established a link between the threatened harm and his political beliefs by testifying that his family had received these threats because of his political activities in the student organization MERS.[3] The death threats directed at the respondent's family members were first carried out when the respondent's brother, Alejandro, was slain in a noncombat situation. The Salvadoran Government appears, at a minimum, to have been unable to control the paramilitary "Death Squads," whose mission was to annihilate suspected political opponents.

The respondent's direct and uncontradicted testimony concerning life-threatening messages left at his family's home, as well as his testimony regarding the subsequent murder of his brother by a "Death Squad," proves that the respondent had good reason to fear persecution prior to his decision to join the guerrillas in 1980. While the deaths of the respondent's mother and sister reflect that paramilitary forces in El Salvador had an ongoing interest in the respondent's family, we need not consider those tragic deaths in analyzing the respondent's eligibility for asylum, since we have concluded that a reasonable person in the respondent's position would have feared political persecution even before the respondent began his association with the Salvadoran guerrillas.[4]

---

[2]The immigration judge did not comment on the respondent's credibility in his decision but appears to have accepted the respondent's testimony as truthful. Based upon our review of the record, we find that the respondent set forth a coherent and consistent account concerning the reasons that he fears persecution in El Salvador. We note further that the immigration judge continued the proceedings prior to his entry of a decision so that respondent's counsel could attempt to obtain evidence from El Salvador to corroborate the respondent's asylum request. The record reflects that respondent's counsel did not receive a response from El Salvador regarding the inquiry which he made on the respondent's behalf. *See Matter of Dass*, 20 I&N Dec. 120, at 124 (BIA 1989) (corroborative "evidence should be submitted where available").

[3]The respondent's characterization of MERS as a noncommunist student organization whose members were involved in peaceful political protest has not been challenged at any stage of the proceedings.

[4]No issue of ineligibility for asylum based on participation in the persecution of

147

Based on .the foregoing, we find that the respondent has demonstrated statutory eligibility for asylum. The Service supports a grant of asylum for the respondent and has made no objection to his receiving discretionary relief.[5] We accordingly will sustain the appeal and grant relief in the exercise of discretion. Because the respondent's asylum application will be approved, we need not address the issue of his eligibility for withholding of deportation under the more demanding section 243(h) standard. *Matter of Mogharrabi, supra,* at 449.

**ORDER:**   The appeal from the denial of asylum is sustained.

**FURTHER ORDER:**   The respondent's application for asylum pursuant to section 208(a) of the Act is approved, and the proceedings are terminated.

---

others on account of their political opinions has been raised in this appeal. *See* section 101(a)(42)(B) of the Act.

[5] While our finding that the respondent is statutorily eligible for asylum is based on events which occurred in 1979 and 1980, we need not discuss, in light of the Service's position, the discretionary considerations regarding "past persecution" which were outlined in *Matter of Chen,* 20 I&N Dec. 16 (BIA 1989).